The State, ex rel. Riffe et al., *v.* Brown, Secy. of State.

[Cite as State, ex rel. Riffe, v. Brown (1977),
51 Ohio St. 2d 149.]

(No. 77-666—Decided July 8, 1977.)

150

*Mr. William J. Brown*, attorney general, *Mr. David J. Young* and *Mr. David P. Hiller*, for relators.

*Mr. William J. Brown*, attorney general, *Messrs. Crabbe, Brown, Jones, Potts & Schmidt, Mr. William L. Schmidt* and *Mr. Ira Owen Kane*, for respondent.

*Per Curiam.* The issue presented is whether Sections 1, 2, 3 and 4 of Amended Substitute Senate Bill No. 125, pertaining to voting procedures, take immediate effect or are

effective on August 30, 1977, 90 days after the filing of the Act with the Secretary of State.

Section 1 of Article II of the Ohio Constitution expressly states that "the people reserve to themselves the power to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided. They [the people] also reserve the power to adopt or reject any law, section of any law or any item in any law appropriating money passed by the general assembly, *except as hereinafter provided * * *.*" (Emphasis added.)

Sections 1c and 1d of Article II of the Ohio Constitution, adopted simultaneously by the electorate in 1912, govern the effective dates of legislative enactments in this state.

Section 1c reads:

"The second aforestated power reserved by the people is designated the referendum, and the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly. No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided. When a petition, signed by six per centum of the electors of the state and verified as herein provided, shall have been filed with the secretary of state within ninety days after any law shall have been filed by the governor in the office of the secretary of state, ordering that such law, sections of such law or any item in such law appropriating money be submitted to the electors of the state for their approval or rejection, the secretary of state shall submit to the electors of the state for their approval or rejection such law, section or item, in the matter herein provided, at the next succeeding regular or general election in any year occurring subsequent to sixty days after the filing of such petition, and no such law, section or item shall go into effect until and unless

approved by a majority of those voting upon the same. If, however, a referendum petition is filed against any such section or item, the remainder of the law shall not thereby be prevented or delayed from going into effect."

Section 1d provides:

"Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. Such emergency laws upon a yea and nay vote must receive the vote of two-thirds of all the members elected to each branch of the general assembly, and the reasons for such necessity shall be set forth in one section of the law, which section shall be passed only upon a yea and nay vote, upon a separate roll call thereon. The laws mentioned in this section shall not be subject to the referendum."

Respondent agrees with relators that pursuant to the plain wording of Article II, Section 1d, a law providing for an appropriation for current expenses [of the state government] takes effect immediately. Respondent agrees further that Am. Sub. S. B. No. 125, in Section 5 thereof, provides for an appropriation for current expenses of the state government.

Respondent contends that since Am. Sub. S. B. No. 125 (hereinafter called the "law") *contains* such an appropriation in Section 5 thereof, that section took immediate effect, but that all other items or sections are subject to referendum.

The inconsistency in positions posited by the parties herein can most reasonably be attributed to a fundamental misapprehension of terminology contained in those constitutional provisions. For example, respondent's third proposition of law begins thusly:

"An *Act* which contains a law * * *," and elsewhere in respondent's brief, the terms "law" and "Act" are used interchangeably. The proper relationship of those words is best expressed in the following portion of another ref-

erendum case, *Pfeifer* v. *Graves* (1913), 88 Ohio St. 473, 480:

"A proposed law is first initiated by a petition filed with the secretary of state, who transmits it to the general assembly (if the petition be properly signed and verified), where it is introduced as *a bill*; if both bodies adopt and pass it as proposed it becomes *an act*, and when it is enrolled and filed by the governor with the secretary of state it becomes *a law* * * *." (Emphasis *sic*.)

Much of the confusion stems from the following imprecise judicial musings in *State, ex rel. Donahey*, v. *Roose* (1914), 90 Ohio St. 345, 349, decided shortly after the enactment of the subject constitutional provisions:

"While perhaps some of the sections of this act may have been subject to the referendum provisions of Section 1*c* of Article II of the Constitution, yet Section 1*d* of Article II expressly exempts laws providing for tax levies from the operation of the preceding provision of the Constitution. Therefore section 1 of this act, providing for a tax levy of one-half of one mill on taxable property within the state, went into immediate operation when approved and signed by the governor.

"The contention of counsel that an act containing some sections subject to the referendum will take effect only as a whole after the expiration of ninety days from the date it is filed in the office of the secretary of state, is not sustained by the provisions of Section 1*c* of Article II of the Constitution. That section of the constitution expressly authorizes a referendum upon any section of a law or any item of a law appropriating money. It follows that such sections of a law as are not subject to the referendum will go into immediate effect notwithstanding other sections or other items may be subject to the delay incident to a referendum or the right to petition therefor."

The opinion of the court then goes on to immediately state that "the question is no longer of any importance" because of the extremely hypothetical nature of the discussion.

154

Whatever precedential value the *Roose* case may have, it must be balanced against its operative portions being largely *obiter dictum*. Respondent, however, relies upon paragraph two of the syllabus in *Roose* which reads as follows:

"Section 1c of Article II of the Constitution of Ohio expressly provides for a referendum not only upon any law but any section of a law. All sections of a law not subject to the referendum provisions of this section of the constitution go into immediate effect when approved and signed by the governor."

In our view, a law which is "not subject to the referendum provisions" of Section 1c is a law of the nature set forth in Section 1d. One such law so mentioned is a law providing for "* * * appropriations for the current expenses of the state government * * *." Accordingly, pursuant to the foregoing paragraph of the *Roose* syllabus, "[a]ll [meaning, each and every] sections of a law not subject to the referendum provisions of * * * section [1c] of the constitution go into immediate effect when approved and signed by the governor."

As to other laws, which are not *laws mentioned in Section 1d*, but which may similarly be laws "appropriating money," such laws do not go into effect for 90 days and the referendum process of Section 1c is available. The sections and items of any law thus subject to referendum are likewise, but severally or collectively, subject to referendum according to the express provisions of Section 1c. Inasmuch as a law mentioned in Section 1d, by the terms of that constitutional provision, is clearly ineligible for referendum, the sections, items or other parts of such law must necessarily share that constitutionally imposed disability.[1]

---

[1] It is outside the competence of this court to redraft Section 1d by holding that "sections of laws mentioned in this section shall not be subject to the referendum," as the respondent's argument would require us to do. When the framers desired the Constitution to apply to sections of laws, as in Section 1c, they expressed that desire in plain language. Sections 1c and 1d were drafted and adopted at the same time, and

The clearest illustration to be found in the annals of this court as to the point just made, is the case of *State, ex rel. Davies Mfg. Co.,* v. *Donahey* (1916), 94 Ohio St. 382. In that case a manufacturer of auto tags sought payment for tags furnished to the state on a contract executed July 1, 1915. The auditor refused because the relator had failed to comply with a competitive bidding requirement which had been enacted along with an appropriation for the current expenses of the state government, as part of an appropriation Act, passed May 27, 1915.

The relator therein argued that the competitive bidding item of the law was not *in effect* at the time of the execution of his contract because it "was an 'item in such law appropriating money,' which subjected it [the item] to a referendum under the referendum provisions of the Ohio constitution; [and] that it [the item] * * * [therefore] remained inchoate until the expiration of 90 days after the same was filed in the office of the secretary of state * * *." *State, ex rel. Davies Mfg. Co.,* v. *Donahey, supra,* at page 385.

The court held that the appropriation Act, including the required competitive bidding provision,[2] went into immediate effect and was not subject to a referendum under Section 1c, Article II of the Ohio Constitution.

Chief Justice Nichols, in *State* v. *Lathrop* (1915), 93 Ohio St. 79, 87, observed that "[t]here is a class of laws not subject to the ninety-day period. Laws providing for state levies, appropriations for current expenses of the

we must assume that the framers intended the terms "laws" and "sections of laws" to have consistent meanings in both. It logically follows that since a law containing a section appropriating funds for current expenses of state government is a law mentioned in Section 1d, it is not a law subject to the referendum.

[2]Respondent argues that the conditional influence of the competitive bidding provision upon the law under review required a decision that the provision was not subject to referendum. Whether such a fine distinction was intended to be set forth for the purposes of that case or for all time we need not here decide. In the cause *sub judice,* we find that Section 5 of the law, conceded to be not subject to referendum, is clearly a condition upon the remaining sections of the law.

state government and state institutions and emergency laws, as defined in Section 1*d* of Article II, go into immediate effect by the express language of the Constitution.'' The court noted further that Section 1d is a direct limitation on Section 1c.[*]

The court held further, at page 88, that Section 1d emergency laws ''go into immediate effect when approved by the governor, and that all other acts go into effect ninety days after the same have been filed with the secretary of state, regardless of the date of approval by the governor.''

---

[*]Chief Justice Nichols stated further at pages 86 and 87:

"When, then, under our constitution, does a nonemergency act go into effect?

"This question involves a construction of two apparently conflicting sections of the Constitution, that of Section 1c of Article II and Section 16 of Article II.

"Section 16 of Article II provides that if the governor approves a bill he shall sign it and thereupon it shall become a law. Section 1c of Article II provides that 'No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided.'

"The 'except as herein provided' clause has undoubted reference to the provision in Section 1d of Article II, to the effect that laws providing for tax levies, etc., and emergency laws shall go into immediate effect."

The "etc." referred to in the above language could only mean "appropriations for the current expenses of the state government and state institutions."

Eight years after the decision in *Lathrop, supra,* in *State, ex rel. Keller,* v. *Forney* (1923), 108 Ohio St. 463, 465, Wanamaker, J., after citing portions of Sections 1c and 1d of Article II of the Ohio Constitution, stated the following:

"We have therefore a general policy of power reposed in the people to approve or disapprove, to adopt or reject, by referendum, any law or section of law passed by the General Assembly of Ohio, with these three particular exceptions:

"(1) 'Laws providing for tax levies.'

"(2) Laws providing for 'appropriations for the current expenses of the state government and state institutions.'

"(3) 'Emergency laws necessary for the immediate preservation of the public peace, health or safety.'"

The foregoing statement of more than 60 years vintage makes clear the role of the Secretary of State in connection with laws mentioned in Section 1d, Article II: he has no function in approving or otherwise authorizing the effectiveness of such laws. The brief filed on his behalf has not set forth any authority for the Secretary of State to set or establish the effective date of a law.' Rather, counsel for respondent chooses to rely on an alleged ''longstanding practice of the respondent * * * to accord separate effective dates to an Act.'' Relators, citing *State, ex rel. Delaney,* v. *Holmes* (1915), 5 Ohio App. 1, aptly point out that ''[a]cquiescence in the action of a person or official board cannot be charged where the person or board taking such action was without power or jurisdiction to act.''

In conclusion, by virtue of the decision reached herein, respondent is under a clear legal duty to carry out the provisions of the law designated Am. Sub. S. B. No. 125. Because relators are without a plain and adequate remedy in the ordinary course of the law, a writ of mandamus is therefore allowed (*State, ex rel. Pressley,* v. *Indus. Comm.* [1967], 11 Ohio St. 2d 141), but a writ of prohibition, being rendered thereby unnecessary, is hereby denied as moot.

*Writ of mandamus allowed.*
*Writ of prohibition denied.*

CELEBREZZE, W. BROWN, SWEENEY and LOCHER, JJ., concur.

O'NEILL, C. J., HERBERT and P. BROWN, JJ., dissent.

---

'Respondent cites several cases in his brief which, it is claimed, direct this court to arrive at a contrary result. However, even a casual view of those decisions exhibits their precedential deficiencies. The facts of the most relevant decision (*State, ex rel. Keller,* v. *Forney, supra*) are inapposite to the facts of the cause at bar. That case presented the question whether the Taft Act was a law "providing for tax levies" within the meaning of Section 1d, Article II, and thereby expressly exempted from the referendum provisions of Section 1c of the Article. After examining the sole question of whether the Act qualified under Section 1d, the court concluded, at page 471, "[t]here can be no doubt that the Taft Act is not a law 'providing for tax levies,'" and thereby decided the issue in the negative.

O'Neill, C. J., dissenting.

Today, the majority, in effect, repeals the people's constitutional right to referendum—the right to vote to adopt or to reject any section of any law passed by the legislature.

There is no provision of the Constitution, no case law and no legal precedent which requires this court to reach that result.

The people's constitutional right of referendum is one of the bedrocks of democracy, yet the approach of the majority appears to manifest more concern for its circumvention that for its preservation.

The majority opinion lays down no limitations, no reservations and no guidelines; it holds that the General Assembly, by inserting in any bill any appropriation for any current expense item, can deny to the people the right of referendum on every law, section of law and item of appropriation which is enacted into law by the passage of that bill.

By their votes in a free election on Sections 1 and 1c of Article II of the Ohio Constitution the people of Ohio reserved to themselves the right of referendum. By the votes of four members of this court, that right has been reduced to a mere privilege, which the General Assembly may grant or deny by the insertion of an appropriation section in any piece of legislation.

It is ironic that the demise of the referendum stems from the very forces which the referendum was designed to control.

Nearly 65 years ago, on September 3, 1912, the electors of Ohio adopted amendments to Article II: Sections 1 to 1g of the Ohio Constitution providing for initiative and referendum. That special election marked the high tide of the reform movement in Ohio state government. Of the 41 amendments on the ballot that day none was more representative or symbolic of the Progressive Era than the initiative and referendum. The Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912)

reflect that 17 days were devoted to considering the initiative and referendum.

The delegates heard the eloquent statesman William Jennings Bryan address the Convention and state:

"The initiative and referendum do not overthrow representative government—they have not come to destroy but to fulfill. The purpose of representative government is to represent, and that purpose fails when representatives mis-represent their constituents. Experience has shown that the defects of our government are not in the people themselves, but in those who, acting as representatives of the people, embezzle power and turn to their own advantage the authority given them for the advancement of the public welfare. It has cost centuries to secure popular goverment; the blood of millions of the best and the bravest has been poured out to establish the doctrine that governments derive their just powers from the consent of the governed.

"All this struggle, all this sacrifice, has been in vain if, when we secure a representative government, the people's representatives can betray them with impunity and mock their constituents while they draw salaries from the public treasury." 1 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912), at page 664.

Former President Theodore Roosevelt supported initiative and referendum as follows:

"I believe in the initiative and the referendum, which should be used not to destroy representative government, but to correct it when ever it becomes misrepresentative.' * * * But in actual practice it has been found in very many states that legislative bodies have not been responsive to the popular will. Therefore I believe that the state should provide for the possibility of direct popular action in order to make good such legislative failure." 1 Proceedings and Debates, *supra*, at page 383.

Prior to today, this court has always upheld the people's right to referendum.

In *State, ex rel. Nolan,* v. *ClenDening* (1915), 93 Ohio St. 264, 277-78, the court stated:

"Now, the people's right to the use of the initiative and referendum is one of the most essential safeguards to representative government. The enemies of the 'I. & R.' persistently misrepresent it as destroying representative government, but it is not so. It is rather a guaranty or safeguard to preserve representative government. It is only when government ceases to be representative of the public welfare that the 'I. & R.' can be successfully invoked. If the people get real representative government there is no occasion for the 'I. & R.' *The potential virtue of the 'I. & R.' does not reside in the good statutes and good constitutional amendments initiated, nor in the bad statutes and bad proposed constitutional amendments that are killed. Rather, the greatest efficiency of the 'I. & R.' rests in the wholesome restraint imposed automatically upon the general assembly and the governor and the possibilities of the latent power when called into action by the voters.* [Emphasis added.]

"There is nothing new or novel about this power so far as basic principles are involved. It has for more than a century been exercised with reference to constitutions, all of which, before their adoption as the organic law of the state, must first be approved by a vote of the people.

"The 'I. & R.,' as to-day understood, simply extends the referendum on constitutions and constitutional amendments to statutes enacted by the state legislature. If the right of referendum is a safe and sane power as to constitutions, it requires more than the ordinary imagination and legal legerdemain to conceive how such right of referendum can be dangerous as to statutes.

"* * * *

"An examination of the various provisions of the constitution shows with what painstaking care the right of referendum was safeguarded, and the provision was made in the constitution expressly denying to the legislature any impairment of the right of referendum * * *."

Section 1g of Article II of the Ohio Constitution pro-

vides, in part, that the referendum provisions "shall be self-executing, except as herein otherwise provided. Laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers herein reserved." In *Shryock* v. *Zanesville* (1915), 92 Ohio St. 375, 382, the court explained the purpose of this language and of the referendum provisions generally in the following words:

"In this connection it will not escape notice that as to the state-wide exercise of the power the constitution goes into the minutest detail, leaving nothing to the action of the general assembly and concluding with the general statement that the provisions of the whole section should be self-executing, *thereby putting it beyond the power of an unfriendly legislature to cripple or destroy it."* (Emphasis added.)

These principles and their proper application determine the single issue presented which is whether Sections 1, 2, 3 and 4 of Amended Substitute Senate Bill No. 125 pertaining to voting procedures went into immediate effect or become effective on August 30, 1977, 90 days after the filing of the act with the Secretary of State and thus are subject to referendum.

The underlying thesis of the two relators, who are the Speaker of the House of Representatives and the President Pro-Tempore of the Senate, is that the addition in the House of a section appropriating funds to a bill which had passed the Senate without an emergency clause or a provision for appropriations has the effect of making the entire Act become immediately effective and not subject to the referendum.

The majority, disregarding some provisions of the Constitution, resolves the question by concluding that any law, including every item and section of that law, becomes immediately effective if it contains any item providing for appropriations for current expenses of the state government.

To arrive at its decision the majority has necessarily overruled, ignored, or improperly distinguished all pre-

vious case law. In addition, the Constitution has been construed so that the exception language of Section 1d, Article II, repeals the general language reserving the right of referendum to the people in Sections 1 and 1c of Article II. This is true for the obvious reason that under the holding of the majority, the General Assembly, by simply adding an appropriation for current expenses of the state, by a bare majority vote, to a substantive change of the permanent laws of Ohio, can emasculate the constitutional right of electors of Ohio to a referendum.

The language of Section 1d providing for a two-thirds vote to have a law go into immediate effect as an emergency measure is also rendered meaningless by the holding of the majority.

Sections 1, 1c, and 1d, of Article II of the Ohio Constitution, adopted by the electorate in 1912, govern the effective dates of legislative enactments in this state.

Section 1 reads, in pertinent part:

"* * * They [the people] also reserve the power to adopt or reject any law, section of any law or any item in any law appropriating money passed by the general assembly, except as hereinafter provided * * *."

Section 1c reads:

"The second aforestated power reserved by the people is designated the referendum, and the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly. No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided. When a petition, signed by six per centum of the electors of the state and verified as herein provided, shall have been filed with the secretary of state within ninety days after any law shall have been filed by the governor in the office of the secretary of state, ordering that such law, section of such law or any item in such law appropriating money be submitted to the electors of the

state for their approval or rejection, the secretary of state shall submit to the electors of the state for their approval or rejection such law, section or item, in the manner herein provided, at the next succeeding regular or general election in any year occurring subsequent to sixty days after the filing of such petition, and no such law, section or item shall go into effect until and unless approved by a majority of those voting upon the same. *If, however, a referendum petition is filed against any such section or item, the remainder of the law shall not thereby be prevented or delayed from going into effect.*" (Emphasis added.)

Section 1d provides:

"Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. Such emergency laws upon a yea and nay vote must receive the vote of two-thirds of all the members elected to each branch of the general assembly, and the reasons for such necessity shall be set forth in one section of the law, which section shall be passed only upon a yea and nay vote, upon a separate roll call thereon. The laws mentioned in this section shall not be subject to the referendum.''

The language of Section 1c providing that "such law, section of such law or any item in such law appropriating money be submitted to the electors of the state for their approval or rejection * * * '' establishes unequivocally that an Act need not necessarily have a single effective date. This was recognized by the court in *State, ex rel. Donahey, v. Roose* (1914), 90 Ohio St. 345, wherein paragraph two of the syllabus reads:

"Section 1c of Article II of the Constitution of Ohio expressly provides for referendum not only upon any law but any section of a law. All sections of a law not subject to the referendum provisions of this section of the constitution go into immediate effect when approved and signed by the governor.''

Laws which are not subject to the referendum and

which go into immediate effect, as set forth in Section 1d, include "[l]aws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health and safety."

Before today the rule was well and wisely settled that exceptions to a general law must be strictly construed. The majority apparently overrules *State, ex rel. Keller,* v. *Forney* (1923), 108 Ohio St. 463 which approved the general rule of construction in its syllabus as follows:

"1. Exceptions to the operations of laws, whether statutory or constitutional, should receive strict, but reasonable, construction.

"2. The language of Section 1d, Article II of the Constitution, expressly enumerating certain exceptions to the people's right to referendum upon acts of the General Assembly, must be construed and applied with reference to this rule."

Never before has this court construed Section 1d of Article II to reach a conclusion, as does the majority, that any section of a law containing an appropriation shields the entire Act from a referendum. In all previous cases involving Section 1d exceptions this court has recognized that the right of referendum attaches to each section of the law not specifically falling within Section 1d. *State, ex rel. Donahey,* v. *Edmondson* (1913), 89 Ohio St. 93, 100; *State, ex rel. Donahey,* v. *Roose, supra,* at page 349; *State, ex rel. Janes,* v. *Brown* (1925), 112 Ohio St. 590, 593; *State, ex rel. Keller,* v. *Forney, supra,* at page 469.

Section 1d, and the phrase, "appropriations for the current expenses of the state government and state institutions," should be read in context with Sections 1 and 1c. All the referendum sections were carefully drafted with the intent of reserving to the people the right of referendum, the right to veto a law passed by the General Assembly when that law misrepresented the wishes of the people. The purpose of excepting appropriations for current expenses was to insure that current expenses, such as salaries and other contractual obligations of the state, would be timely

honored. See 1 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1912), at pages 698-700; *State, ex rel. Janes,* v. *Brown, supra,* paragraph four of the syllabus. All new laws, programs, and non-current expense appropriations not falling within Section 1d are entitled to be challenged by the people in a referendum.

An examination of Amended Substitute Senate Bill No. 125 shows that Sections 1, 2, 3 and 4 thereof do not fall within any of the provisions of Section 1d which would make them immediately effective; *i. e.,* they are not "[l]aws providing for tax levies, appropriations for the current expenses of the state government and state institutions," nor were they declared to be "emergency laws necessary for the immediate preservation of the public peace, health or safety."

The majority accepts relator's contention that: "Pursuant to the plain wording of Article II, Section 1d, a law containing an appropriation for current expenses takes effect immediately." The majority relies upon *State, ex rel. Davies Mfg. Co.,* v. *Donahey* (1916), 94 Ohio St. 382. In that case, the Act in question was, in fact, an Act making general appropriations. The section of the Act, the effective date of which was at issue, contained language prescribing how appropriated monies should be drawn, including a provision concerning competitive bidding. The court concluded, at page 385, that the "appropriation in question was an appropriation for the current expenses of the state government" and that "the limitation with reference to competitive bidding was simply a condition under which the appropriation should be drawn." The court held that the competitive bidding requirement was not subject to referendum, quite properly, since the requirement for competitive bidding applied only as a condition for that particular appropriation and did not become permanent law. To give practical effect to the constitutional exception for appropriations, temporary provisions needed to implement the appropriation must also be effective immediately. But a change in the permanent law governing the people of Ohio, which incidentally may require an appropriation,

is a wholly different matter. Both the constitutional right of referendum and its exceptions should be given proper effect, and neither allowed to destroy the other.

Relators compare *State, ex rel. Davies Mfg. Co.*, v. *Donahey, supra,* with the instant cause as follows: "The competitive bidding requirement for state contracts was quite clearly not a pure appropriation measure just like the portions of Am. Sub. S. B. 125 which prescribe election procedures are not pure appropriation measures. But like the first four sections of Am. Sub. S. B. 125, the competitive bidding provisions at issue in *Donahey* were part and parcel of a law containing an appropriation for current state expenses and integrally related to such pure appropriation portions of the bill."

Relator's comparison is not persuasive. As noted, the Act in *State, ex rel. Davies Mfg. Co.*, v. *Donahey* was a general appropriations Act. The language sought to be referred in *Donahey* consisted of 12 words buried in a 168-page general appropriations Act. The court there concluded that a provision in an appropriation Act concerning competitive bidding was not a separable portion of the Act subject to referendum but that it was a "condition under which the appropriation could be drawn." The court's well-reasoned conclusion in that case is not controlling here as the facts are not apposite. Sections 1, 2, 3 and 4 of the Act in question here are totally unrelated to the appropriation of funds or procedures for their expenditure. Relators would have a 40-page Act of the General Assembly, amending numerous election laws, shielded from referendum because a part of Section 5 of the Act appropriates money for current expenses.

As Judge Learned Hand stated so persuasively in *Central Hanover Bank & Trust Co.* v. *Commissioner* (C. A. 2, 1947), 159 F. 2d 167, 169:

"* * * There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty

than when, with an obsequious show of submission, it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen. That there are hazards in this is quite true; there are hazards in all interpretation, at best a perilous course between dangers on either hand; but it scarcely helps to give so wide a berth to Charybdis's maw that one is in danger of being impaled upon Scylla's rocks."

Applying the principle that "It is our duty to give a construction to the constitution as will make it consistent with itself, and will harmonize and give effect to all its various provisions," *Hill* v. *Higdon* (1855), 5 Ohio St. 243, 247; *State* v. *Lathrop* (1915), 93 Ohio St. 79, 87, I would hold:

"Section 1c of Article II of the Constitution of Ohio expressly provides for a referendum not only upon any law but any section of a law." *State, ex rel. Donahey,* v. *Roose, supra* (90 Ohio St. 345).

Any section of a law which changes the permanent law of the state is subject to referendum under the powers reserved to the people by Section 1 of Article II, even though the law also contains a section providing for an appropriation for the current expenses of the state government and state institutions which under Section 1d, Article II, becomes immediately effective.

The majority holding ignores the plain language of the provisions of Section 1c and 1d of Article II which have been part of the Constitution of the state of Ohio since 1912 and totally frustrates the intent of those sections to vest in the electorate the power of referendum.

Respondent Secretary of State thus is under no clear legal duty to "give immediate effect to the election procedures mandated by Amended Substitute Senate Bill No. 125." The writs should be denied.

HERBERT, J., dissenting. I concur in the compelling dissent written by Chief Justice O'NEILL, and express my additional view of this most important cause.

As a reading of the majority opinion shows, the con-

stitutional result to be determined in this action is debatable. The oral arguments and briefs of the parties, plus the deep division in the court, can leave no doubt in any reasonable mind that the decision in this case could be logically written in a manner which would nurture, rather than debilitate, the people's right of referendum. Thus, if only from a standpoint of basic judicial policy, I find it appalling that our court has now veered from its historic posture of guarding this fundamental reservation in Ohio's democratic form of government.

The forceful observations of Wanamaker, J. (*State, ex rel. Nolan*, v. *ClenDening* [1915], 93 Ohio St. 264), cited by Chief Justice O'Neill in his dissent, were concurred in by all seven members of the court at that time. Fifty-five years later, the court again unanimously expressed its view of referendum:

"The requirements for referendum petitions provide the mechanics for securing the ultimate and important goal of the legitimate obtaining of a voted expression of the will of the electorate. Courts should strive to nurture and preserve the integrity of the right of referendum." (*Markus* v. *Bd. of Elections* [1970], 22 Ohio St. 2d 197, 200.)

Only human beings can cause our three branches of government to function. Hence, at any time and in any branch, there exists the real possibility that power will be abused. It can occur unintentionally, but that does not lessen the need for a check or balance to rectify the transgression. By its decision today, the majority has all but swept away the ultimate check upon one of those branches of government: the people's constitutional right to legitimately strike down legislation with which they might strongly disagree.

PAUL W. BROWN, J., dissenting. The majority opinion validates a legislative ploy designed by a present majority of the General Assembly to circumvent the people's power of referendum.

From today forward, the people's constitutional right

to referendum has been abolished, or at the very least, diminished to a mere privilege to be granted by the General Assembly in only those instances where a referendum would not pose a serious threat to the legislation. The approval of this scheme by a majority of this court marks the beginning of the demise of constitutional government in Ohio.