Pfeifer, J.,
dissenting.
{¶ 56} I would deny the writ.
{¶ 57} This case is truly one of first impression. Here, for the first time, this court is analyzing the state’s biennial budget bill for the purpose of determining citizens’ right to seek referendum. Although this court has previously interpreted Sections lc and Id, Article II of the Ohio Constitution in State ex rel. Riffe v. Brown (1977), 51 Ohio St.2d 149, 5 O.O.3d 125, 365 N.E.2d 876; State ex rel. Ohio AFL-CIO v. Voinovieh (1994), 69 Ohio St.3d 225, 631 N.E.2d 582; and State ex rel. Taft v. Franklin Cty. Court of Common Pleas (1998), 81 Ohio St.3d 480, 692 N.E.2d 560, this case is different in that we are asked to interpret those sections in the context of the 2010-2011 budget bill. This difference alters the prism through which we must view the legislation in relation to referendum.
*337 {¶ 58} The people’s power of referendum set forth in Section 1c, Article II of the Ohio Constitution is limited by the General Assembly’s power to raise and disburse funds pursuant to Section Id, Article II. Section 1c, Article II of the Ohio Constitution provides:
{¶ 59} “The second aforestated power reserved by the people is designated the referendum, and the signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly.”
{¶ 60} Section 1c, Article II does indeed allow referendum on appropriations, namely, “any item in any law appropriating money passed by the general assembly.” But Section Id, Article II limits referendum’s reach:
{¶ 61} “Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. * * * The laws mentioned in this section shall not be subject to the referendum.”
{¶ 62} Appropriations for “the current expenses of the state government and state institutions” are the type of appropriations shielded from referendum. The exceptions in Section Id, Article II allow the legislature to budget without the uncertainty that referendum brings to the legislative process. Free from the threat of referendum, obligations and the means to fulfill those obligations are preserved with predictability. The exemption from referendum allows the state to make good on its liabilities; without it, the budget could remain in limbo for over a year, leaving the state unable to pay its “current expenses.” With the shield from referendum, the business of the state moves forward, leaving budget-related legislation in place.
{¶ 63} The legislation contained in Am.Sub.H.B. No. 1 (“H.B. 1”) related to video lottery terminals (“VLTs”) is no mere legislative add-on, snuck into a mammoth bill. Instead, the VLT legislation is at the very heart of the budget bill, at the very heart of how Ohio is going to pay for its spending over the next two years. Without VLT-enabling legislation, the budget crumbles. Pursuant to H.B. 1, a $2,267 billion appropriation for schools is dependent upon the implementation of VLTs in Ohio. Without the income expected from VLTs, a large part of the funding for that appropriation vanishes, leaving an $851.5 million hole in the budget.
{¶ 64} The money to be raised by VLTs is directly and inextricably linked to a specific appropriation. R.C. 3770.06(B) requires net profits from all lottery functions — including proceeds from VLTs- — to be deposited into the Lottery Profits Education Fund. For fiscal years 2010 and 2011, the budget bill requires *338 that approximately $2,267 billion flow directly from the Lottery Profits Education Fund to local school districts according to the Foundation Funding formula. Line 200612 of the budget bill instructs that some $2,267 billion from the Lottery Profits Education Fund — more than $990 million in fiscal year 2010, and nearly $1.3 billion in fiscal year 2011 — will go to local schools in the biennium. See H.B. 1 at 2797. At regular intervals throughout the budget period, monies are issued from the Lottery Profits Education Fund to the treasurer for disbursement to school districts throughout the state. There is no commingling of funds — every cent of the estimated $851.5 million VLT revenue will go into the Lottery Profits Education Fund, and every cent of that fund will go to Ohio schools.
{¶ 65} With VLT-enabling legislation at risk of referendum, the General Assembly cannot make the appropriation from the Lottery Profits Education Fund that it had budgeted. To decimate the fund is to kill the appropriation that comes from that fund. There is no spending without a source of funds.
{¶ 66} The highest courts of Michigan and Maryland have held that a law that raises revenue and then appropriates it for a specific purpose is sheltered from the referendum power. Cty. Rd. Assn. of Michigan v. Bd. of State Canvassers (1979), 407 Mich. 101, 282 N.W.2d 774; Kelly v. Marylanders for Sports Sanity, Inc. (1987), 310 Md. 437, 530 A.2d 245. The Michigan Constitution exempts “acts making appropriations for state institutions” from the right of referendum. Section 9, Article 2. In Cty. Rd. Assn., citizens sought referendum on legislation that increased taxes on motor vehicle fuel and vehicle weight. A separate bill established allocations for transportation projects. The Michigan Supreme Court held that the statutes establishing the taxes should be read in pari materia with appropriation statutes:
{¶ 67} “ ‘Statutes In pari materia are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose. It is the rule that in construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference one to the other.’ ” Cty. Rd. Assn., 407 Mich, at 119, 282 N.W.2d 774, quoting Detroit v. Michigan Bell Telephone Co. (1965), 374 Mich. 543, 558, 132 N.W.2d 660.
{¶ 68} The court held that the taxes and the expenditures for roadways “must be viewed as a comprehensive, single legislative program.” Cty. Rd. Assn., 407 Mich, at 118, 282 N.W.2d 774. The court pointed to the statements of the governor and to legislative history to establish the inextricable linkage between the taxing and appropriations statutes: “Both the Governor’s stated approach and what legislative history is available suggest * * * ‘a comprehensive system for the collecting of specific taxes on motor vehicles and motor vehicle fuels, the *339 allocation of funds therefrom and the use thereof for (transportation) purposes.’ ” (Footnote deleted.) Id., quoting Michigan Good Rds. Fedn. v. Alger (1952), 333 Mich. 352, 360-361, 53 N.W.2d 481.
{¶ 69} Likewise, the highest court in Maryland has held that a “revenue raising and spending measure” is “embraced within the exclusionary provisions contained in the Referendum Amendment.” Kelly v. Marylanders for Sports Sanity, Inc., 310 Md. at 461, 530 A.2d 245. The Maryland Constitution exempts from the referendum power “appropriation[s] for maintaining the State Government.” Section 2, Article XVI. The legislation involved in Kelly was a comprehensive scheme to raise funds to acquire land and construct sports facilities at Camden Yards for the Baltimore Orioles and a possible NFL team, including provisions authorizing the Stadium Authority to issue bonds to raise revenue for the project and a requirement that the State Lottery Agency conduct each year between two and four sports lotteries for the benefit of the Stadium Authority. Kelly, 310 Md. at 439-444, 530 A.2d 245. The court held that an untenable result would follow if the court attempted to detach the various provisions from one another. “Considered apart, the stadium bills would not be workable to achieve the objective of the appropriation,” and to sever the provisions “would scuttle the entire project by fatally undermining its dominant purpose — to finance the acquisition of a site upon which to construct sports stadiums.” Kelly, 310 Md. at 474, 530 A.2d 245. Accordingly, the court concluded, the legislature intended for the provisions to “function in tandem as a unitary solution to its singular objective — an objective which it timed for immediate implementation.” Kelly, 310 Md. at 473, 530 A.2d 245.
{¶ 70} These state supreme courts have correctly understood that the appropriations exception to the referendum power “has as its constitutional purpose protecting from referendum the purpose or object of the legislative appropriation.” (Emphasis sic.) Kelly, 310 Md. at 472, 530 A.2d 245. It is the job of courts to determine whether the “dominant statutory objective” of the appropriation can be implemented without the supporting legislation. Id. The dominant statutory objective of the appropriation at issue in this case is the funding of the Lottery Education Fund and the concomitant funding of Ohio schools. Without the supporting VLT-enabling legislation, the objective of the appropriation cannot be implemented.
{¶ 71} The shield for appropriations from referendum is useless if the funding source of the appropriation is not also shielded from referendum. Otherwise, a tiny minority (in Ohio, six percent of the voting electorate, Section lc) can suspend the operation of an otherwise valid appropriation by targeting its funding source for a referendum challenge. The resulting hole in the budget throws the entire finances of the state into disarray, affecting other appropriations.
*340 Langdon Law, L.L.C., David R. Langdon, Thomas W. Kidd Jr., and Bradley M. Peppo; Jones Day, Michael A. Carvin, Douglas R. Cole, and Chad A. Readier, for relators.
Richard Cordray, Attorney General, and Richard N. Coglianese, Erick D. Gale, and Pearl M. Chin, Assistant Attorneys General, for respondent.
Richard Cordray, Attorney General, Benjamin C. Mizer, Solicitor General, Alexandra T. Schimmer, Chief Deputy Solicitor General, David M. Lieberman, Deputy Solicitor, and William C. Becker, Assistant Attorney General, for intervening respondents.
Maurice A. Thompson, urging granting of the writ for amici curiae the Buckeye Institute for Public Policy Solutions, Citizens in Charge, Coalition Opposed to Additional Spending & Taxes, Ohio Citizen Action, and the Ohio Freedom Alliance.
Matthew J. Burkhart and J. Michael Johnson, urging granting of the writ for amici curiae ATM Education, Buckeye Christian Schools Association, Church Coalition for Decency, Citizens for Community Values, Citizens Media Group/Christian Citizen USA, Constitution Party of Ohio, Eagle Forum of Ohio, Eischen Financial Group, Evangelical Fellowship Chapel, Family First PAC, Grove City Church of the Nazarene, Homemakers for America, Institute for Principled Policy, Jobs Plus Employment Network, Mission America, New Hope Christian Center, Ohio Governmental Prayer Alliance, Pass the Salt Ministries, Richland Community Family Coalition, the Ridge Project, Inc., Rocky Fork Formulas, Inc., Sanctity of Life Foundation, Touch the World Ministry, Inc., *341 Vandalia United Methodist Church, Victory in Truth Ministries, Women Influencing the Nation, Pastor Peter J. Foxx, Ronald Hood, Stephen J. Koob, Twyla Roman, and Pastor Wayne W. Scott.
*340 {¶ 72} This case is about certainty in Ohio’s budget. It is not about whether the governor and the General Assembly acted prudently in dismissing the people’s will — demonstrated time and again at the ballot box — to keep slot machines out of Ohio. The budget crafted by the governor and enacted by the General Assembly cannot be overturned by referendum. However, the people retain the right to prohibit by constitutional initiative slot machines of any type or by any name. The governor and the individual members of the General Assembly remain answerable to the people through election.
{¶ 73} The chaos that may follow this court’s decision today cannot be blamed entirely on the majority opinion, which applies a narrow but plausible interpretation of our constitution’s limits on referendum. The governor and the General Assembly have sown the wind, and now with a budget thrown into complete disarray, we shall all reap the whirlwind.
*341 Ulmer & Berne, L.L.P., and Donald J. Mooney Jr., urging denial of the writ for amici curiae Ohio Federation of Teachers, Ohio School Business Officials Association, Ohio Association of Public School Employees, Eve Bolton, and Jane Simon.
Vorys, Sater, Seymour and Pease, L.L.P., and Suzanne K. Richards, Richard D. Schuster, Michael R. Thomas, and Michael J. Hendershot, urging denial of the writ for amici curiae Ohio Council of Retail Merchants and Ohio Farm Bureau Federation.