[This opinion has been published in *Ohio Official Reports* at 69 Ohio St.3d 225.]

THE STATE EX REL. OHIO AFL-CIO ET AL. *v*. VOINOVICH, GOVERNOR, ET AL.

THE STATE EX REL. GELTZER *v*. VOINOVICH, GOVERNOR, ET AL.

THE STATE EX REL. UNITED AUTO AEROSPACE & AGRICULTURAL WORKERS

OF AMERICA ET AL. *v*. INDUSTRIAL COMMISSION OF OHIO ET AL.

[Cite as *State ex rel. Ohio AFL-CIO v. Voinovich*, 1994-Ohio-1]

*Constitutional law—General Assembly—Am.Sub.H.B. No. 107—Violation of one-subject rule remedied, how—Legislative Act valid under three-consideration provision of Section 15(C), Article II, Ohio Constitution, when.*

(Nos. 93-2057, 93-2059 and 93-2060—Submitted Dec. 15, 1993—Decided April 8, 1994.)

IN MANDAMUS, PROHIBITION and QUO WARRANTO.

{¶ 1} H.B. No. 107 was introduced in the House of Representatives ("the House") on February 4, 1993 as a four-page bill to make biennial appropriations for the Bureau of Workers' Compensation. A companion bill that would provide biennial appropriations for the Industrial Commission, H.B. No. 106, was introduced in the House the same day.

{¶ 2} Subsequently, the House forwarded both bills to the House Finance and Appropriations Committee for review.

{¶ 3} The House Finance and Appropriations Committee's review of these bills lasted four months. On June 3, 1993, the committee reported back to the House a substitute version of H.B. No. 107. Along with the original appropriations provisions, the bill now contained several amendments to numerous substantive sections of the Ohio Revised Code dealing with workers' compensation. The full House considered Am.Sub.H.B. No. 107 on June 9, 1993. Three amendments were

added to the bill from the floor, and the amended bill was voted on and passed as amended.

{¶ 4} The Senate received Am.Sub.H.B. No. 107 from the House and introduced it on June 10, 1993. Five days later, on June 15, 1993, the Senate referred the bill to the Senate Commerce and Labor Committee.

{¶ 5} On June 22, 1993 the Senate Commerce and Labor Committee jointly considered Am.Sub.H.B. No. 107, H.B. No. 106 (the Industrial Commission appropriations bill), and S.B. No. 152 (a bill which made several substantive changes to the workers' compensation system). Following numerous amendments to each bill, the Senate Commerce and Labor Committee incorporated the language of H.B. No. 106 and Am.Sub.H.B. No. 107 into S.B. No. 152 and subsequently incorporated the provisions of S.B. No. 152 into Am.Sub.H.B. No. 107.

{¶ 6} The next day, June 23, 1993, the Senate Commerce and Labor Committee reported Am.Sub.H.B. No. 107 back to the Senate and recommended its passage. As reported back, the substitute bill included appropriation provisions for the Bureau of Workers' Compensation and the Industrial Commission, as well as nonappropriation provisions that amended substantive sections of the Ohio Revised Code dealing with workers' compensation. Later that day, after an additional six amendments were approved on the Senate floor, Am.Sub.H.B. No. 107 was passed by the full Senate.

{¶ 7} The version of Am.Sub.H.B. No. 107 considered and adopted by the Senate was returned to the House which, on June 29, 1993, refused to concur. Nevertheless, the Senate insisted on its amendments and asked for a conference committee. Consequently, three members from each chamber were appointed to meet, consider the bill and resolve the disputed issues.

{¶ 8} On July 20, 1993, the conference committee issued a report recommending the version passed by the Senate along with certain additional amendments made by the conference committee. Later that day, both the House

and the Senate voted on and passed Am.Sub.H.B. No. 107 as it was agreed to in the conference committee.

{¶ 9} On July 21, 1993, Am.Sub.H.B. No. 107 was sent to the Governor, who signed the bill into law after exercising a line-item veto.[1]

{¶ 10} The final version of Am.Sub.H.B. No. 107 abolished the five-member Industrial Commission of Ohio, created a new three-member Industrial Commission, substantially amended the workers' compensation law, and made appropriations for the Bureau of Workers' Compensation and the new commission. Appropriations for the biennium took effect under the Act when the Governor signed the bill on July 21, 1993. Most other provisions in the Act were to take effect on October 20, 1993.

{¶ 11} On October 15, 1993, relators filed the following three original actions in this court, all of which make various challenges to the constitutionality of Am.Sub.H.B. No. 107.

## No. 93-2057

{¶ 12} Case No. 93-2057 is an original action in mandamus and prohibition filed by the Ohio AFL-CIO, a citizen taxpayer, and a board member of a regional board of review. Relators seek a writ of mandamus (1) ordering the Governor to take no action under the new law and to appoint no new commissioners, (2) ordering the State Auditor and Treasurer not to withhold the pay of the old commissioners and the regional board members, and (3) severing the appropriations provisions from Am.Sub.H.B. No. 107 and declaring the nonappropriations provisions unconstitutional and void. Relators seek a writ of prohibition preventing the new commissioners from acting or hearing cases as the Industrial Commission.

---

1. The item vetoed is not in dispute here.

No. 93-2059

{¶ 13} Case No. 93-2059 is an original action in mandamus and quo warranto filed by the public member of the former Industrial Commission. Relator asks this court to (1) find that the abolishment of his term as commissioner deprived him of his position in violation of his right to due process of law under the state and federal Constitutions, and (2) find that Am.Sub.H.B. No. 107 is void because it violates the three-consideration provision of Section 15(C), Article II of the Ohio Constitution. Relator seeks a writ of mandamus compelling the Governor not to proceed to implement the new law and to grant relator certain salary increases. Relator also seeks a writ of mandamus compelling the State Auditor and Treasurer to continue paying relator his salary. Finally, relator seeks an order that relator is the rightful public member of the Industrial Commission.

No. 93-2060

{¶ 14} In case No. 93-2060, the United Auto Aerospace & Agricultural Implement Workers of America and several members of the General Assembly filed an original action in mandamus against the Bureau of Workers' Compensation, the Industrial Commission and the Attorney General. Relators seek a writ of mandamus compelling the bureau and the commission not to implement the non-appropriation provisions of Am.Sub.H.B. No. 107, but rather to continue processing workers' compensation claims under the old law.

_____

*Stewart Jaffy & Associates Co., L.P.A., Marc J. Jaffy* and *Stewart R. Jaffy*, Columbus, for relators in case No. 93-2057.

*Rishel, Myers & Kopech* and *James R. Rishel*, Columbus, for relator in case No. 93-2059.

*Esther S. Weissman Co., L.P.A.*, and *Esther S. Weissman*, Cleveland, for relator in case No. 93-2060.

*Lee I. Fisher*, Attorney General, *Richard A. Cordray*, State Solicitor, *Andrew S. Bergman* and *James M. Harrison*, Assistant Attorneys General, for respondents in case Nos. 93-2057, 93-2059 and 93-2060.

*Porter, Wright, Morris & Arthur* and *Kathleen M. Trafford*, Special Counsel, for intervening respondent Ohio Bureau of Workers' Compensation in case No. 93-2060.

*Gallon & Takacs Co., L.P.A.*, and *Theodore A. Bowman*, urging granting of writ for amicus curiae, Ohio Academy of Trial Lawyers in case No. 93-2057.

*Vorys, Sater, Seymour & Pease, John C. Elam* and *Robert N. Webner*, urging denial of writ for amici curiae, Ohio manufacturers Association, Ohio Self-Insurers Association, Ohio Council of Retail Merchants, Ohio Chamber of Commerce, National Federation of Independent Business, Ohio Farm Bureau Federation, Ohio Business Roundtable and Council of Smaller Enterprises in case Nos. 93-2057, 93-2059 and 93-2060.

————————————

**WRIGHT, J.**

**{¶ 15}** These three cases challenge the constitutionality of Am.Sub.H.B. No. 107 of the 120th Ohio General Assembly. The cases present the following constitutional issues: (1) whether Am.Sub.H.B. No. 107 violates the one- subject rule of Section 15(D), Article II of the Ohio Constitution; (2) whether the bill violates the three-consideration provision of Section 15(C), Article II of the Ohio Constitution; (3) whether the bill denies the citizens of this state their right to a referendum under Section 1, Article II of the Ohio Constitution; and (4) whether abolishing the old Industrial Commission and creating a new one deprives the former commission members of their positions without due process of law and violates the constitutional doctrine of separation of powers. Case No. 93-2059 presents the further question of whether the Governor violated former R.C.

4121.02(E) by failing to grant relator Geltzer an annual salary increase of five percent.

I

{¶ 16} In their first proposition of law relators in case No. 93-2057 argue that Am.Sub.H.B. No. 107 contains more than one subject and therefore violates the one-subject rule of Section 15(D), Article II of the Ohio Constitution. Relators argue that the bill contains seven different subjects: appropriations for the Bureau of Workers' Compensation, appropriations for the Industrial Commission, structural changes to the Bureau of Workers' Compensation, structural changes to the Industrial Commission, changes to the substantive provisions of the workers' compensation law, the creation of a new employment intentional tort, and the creation of a child labor exemption for the entertainment industry.

{¶ 17} We agree that the provisions creating a new employment intentional tort and the provisions related to the child labor exemption violate the one-subject rule. The provisions related to the remaining five topics, however, are all directed at the same subject, workers' compensation, and therefore do not violate the one-subject rule.

{¶ 18} Section 15(D), Article II of the Ohio Constitution provides:

"No bill shall contain more than one subject, which shall be clearly expressed in its title. * * *"

{¶ 19} This court has held that Section 15(D), Article II is directory rather than mandatory. *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153. "There is no question that by holding that the one-subject rule is directory and not mandatory, judicial interference with legislative action is reduced." *Id.* at 144, 11 OBR at 439, 464 N.E.2d at 156. However, although we are most reluctant to interfere in the legislative process, we will not "abdicate [our] duty to enforce the Ohio Constitution." *Id*. at 144, 11 OBR at 439, 464 N.E.2d at 157. Accordingly, we will hold enactments invalid under Section 15(D), Article II

whenever there is a "manifestly gross and fraudulent violation" of this provision of the Ohio Constitution. *Id*. at syllabus. But "[*t*]*he mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics.*" (Emphasis added.) *Hoover v. Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580.

{¶ 20} The bill at issue in this case funds the Bureau of Workers' Compensation and the Industrial Commission, contains provisions that structurally change those administrative bodies, and amends the procedural and substantive law underlying the compensation of injured workers. We cannot conclude these provisions are so unrelated that they constitute a "manifestly gross and fraudulent violation" of the one-subject rule of the Ohio Constitution. Although the provisions embrace more than a singular topic, they do have a common purpose: to amend and reform the laws governing the compensation of injured workers and to fund the two agencies that are charged with administering those laws. And they all have a clear common relationship, namely workers' compensation.

{¶ 21} Relators nevertheless assert that the appropriation aspects of Am.Sub.H.B. No. 107 bear no relation to the rest of the bill. We disagree. In *Dix, supra*, the relator contended that the addition of an appropriation provision to a bill which abolished the Ohio Development Financing Commission and which transferred the duties to the Director of Development violated the one-subject rule. We held otherwise, stating that "the one-subject provision is not directed at *plurality* but at disunity in subject matter * * *." (Emphasis added.) *Id*., 11 Ohio St.3d at 146, 11 OBR at 440-441, 464 N.E.2d at 158. The appropriation is "simply the means by which the act is carried out, and the inclusion of such an appropriation does not destroy the singleness of the subject * * *." *Id*. at 146, 11 OBR at 441, 464 N.E.2d at 158. As stated by Professor Ruud, "[t]here seems to be no serious contention that an appropriation is in itself a second subject; therefore, an act may, for example, establish an agency, set out the regulatory program, and make an

appropriation for the agency without violating the one-subject rule." Ruud, "No Law Shall Embrace More Than One Subject" (1958), 42 Minn.L.Rev. 389, 441.

{¶ 22} We see no reason to depart from our holding in *Dix* and declare that the appropriation provisions of Am.Sub.H.B. No. 107 destroy the unity of the bill. The inclusion in the bill of such provisions simply allows the other provisions of the bill to be implemented.

{¶ 23} We have previously stated, however, that intentional torts are completely unrelated to workers' compensation and the employment relationship. In *Brady v. Safety-Kleen Corp.* (1991), 61 Ohio St.3d 624, 576 N.E.2d 722, we held that "[w]hile [a] cause of action [alleging a workplace intentional tort] contemplates redress of tortious conduct that occurs during the course of employment, an intentional tort alleged in this context necessarily occurs outside the employment relationship." *Id*. at paragraph one of the syllabus. Under our decision in *Brady*, the intentional tort provision under newly enacted R.C. 2745.01 is not and cannot be related to the common purpose of the bill, and we therefore hold that such provision violates Section 15(D), Article II of the Ohio Constitution.

{¶ 24} Likewise, we determine that the provisions creating an exemption for the employment of minors violate Section 15(D), Article II of the Ohio Constitution. The provisions amend R.C. 4109.06 by adding the language that R.C. Chapter 4109 does not apply to a minor participating as an actor in a movie or in radio or television productions. In a broad sense this exemption addresses the area of employment, an area also addressed by the workers' compensation laws. However, the purpose, in part, behind Am.Sub.H.B. No. 107 was not to generally amend laws that relate to employment but to specifically amend the workers' compensation laws. The child labor exemption does not in any way touch upon the laws related to workers' compensation. We therefore find that the inclusion of the child labor exemption in Am.Sub.H.B. No. 107 was an actionable violation of the one-subject rule of the Ohio Constitution.

8

**{¶ 25}** Having found that the intentional tort and child labor exemption provisions of Am.Sub.H.B. No. 107 violate Section 15(D), Article II of the Ohio Constitution, we sever those portions from the bill. *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 149, 580 N.E.2d 767, 770. The remaining provisions of the bill do not violate Section 15(D), Article II and pursuant to our decision in Hinkle we save those provisions. We therefore grant relators' request for a writ of mandamus on the issue of whether Am.Sub.H.B. No. 107 violates the one-subject rule of the Ohio Constitution only as the request relates to the intentional tort and child labor exemption provisions of the bill. We deny all other requests for a writ of mandamus and prohibition on this issue.

II

**{¶ 26}** Relators in all three cases argue that Am.Sub.H.B. No. 107 was enacted in violation of the three-consideration provision of Section 15(C), Article II of the Ohio Constitution. That section states in relevant part:

**{¶ 27}** "Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house. No bill may be passed until the bill has been reproduced and distributed to members of the house in which it is pending and every amendment been made available upon a member's request."

**{¶ 28}** Relators' principal argument is that the Senate Commerce and Labor Committee "vitally altered" the bill by incorporating the provisions of H.B. No. 106 (biennial appropriations for the Industrial Commission) and S.B. No. 152 (a bill substantially restructuring the workers' compensation system) into Am.Sub.H.B. No. 107. They contend that the substitute bill should have received three more considerations from each chamber because it was wholly changed.

**{¶ 29}** Relators in case No. 93-2060 further maintain that the conference committee which met to resolve the differences between each chamber's version of Am.Sub.H.B. No. 107 again "vitally altered" the bill, which thereafter received only one consideration in each chamber.

**{¶ 30}** Respondents counter these arguments by indicating that the legislative journals reflect that Am.Sub.H.B. No. 107 did indeed receive the mandatory three considerations from each legislative body. Moreover, they assert that neither the Senate Commerce and Labor Committee nor the conference committee "vitally altered" the bill and that at all times there was a common relationship and purpose between the amendments and the original bill.

**{¶ 31}** This court has interpreted the Ohio Constitution's three-consideration rule on several previous occasions. In *Miller v. State* (1854), 3 Ohio St. 475, 484, the court held that as long as the legislative journals reveal a bill was passed, and there is nothing in the journals to show that the bill was not read as the Constitution requires, then a presumption of compliance arises and the presumption cannot be rebutted with proof. Hence, the court in subsequent cases viewed the three-consideration language to be directory and not mandatory. Compliance with the rule was a matter of enforcement for the General Assembly and not for the judiciary.

**{¶ 32}** In 1973 the Ohio Constitution was amended and the language "and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house" was added to the original three-consideration provision. "Thus, by constitutional mandate, there now exists an inherently reliable immediate source by which the legislature's compliance may be readily ascertained without any undue judicial interference." *Hoover, supra*, 19 Ohio St.3d at 4, 19 OBR at 3, 482 N.E.2d at 578.

**{¶ 33}** As a result of the 1973 amendment, the Hoover court found the holding in *Miller* no longer controlling. Rather, in *Hoover*, the court stated that

"where it can be proven that the bill in question was not considered the required three times, the consequent enactment is void and without legal effect." *Id*. at 3, 19 OBR at 2-3, 482 N.E.2d at 578. The court went on to hold that "[w]here the Ohio Constitution mandates that a recordation be made in the legislative journals reflecting that a particular step in the enactment process has been taken, the absence of entries to that effect renders an enactment invalid." *Id*. at syllabus.

{¶ 34} Relators essentially ask us to extend the holding in Hoover to the cases before us, analogizing the facts of that case to those of the cases under consideration here. We decline to extend our holding because Hoover is factually distinguishable from the present cases.

{¶ 35} In Hoover, the court considered a bill that was introduced in the Senate and originally pertained to criminal non-support. It received some minor amendments, was read three times in the Senate, passed there, and was then sent to the House of Representatives. In the House Judiciary Committee the amended bill was completely stripped of its existing language and in its place was substituted a bill "*completely different in content*" from the one passed by the Senate. (Emphasis *sic*.) *Id*., 19 Ohio St.3d at 5, 19 OBR at 5, 482 N.E.2d at 579. Instead of the subject of criminal non-support the bill now pertained to "the financing, acquisition and construction of hospital and health care facilities for the use of non-profit entities." *Id*. The bill was subsequently enacted into law.

{¶ 36} As stated above, the court modified the holding in *Miller* and thereby provided the plaintiff in Hoover with a cause of action and allowed him to offer evidence that the legislative journal did not reflect "the requisite three considerations in each house * * * in the form in which it was eventually enacted." *Id*., 19 Ohio St.3d at 5, 19 OBR at 4, 482 N.E.2d at 579. Thus, as a result of *Hoover* the three-consideration language of Section 15(C), Article II is no longer directory but is instead mandatory.

**{¶ 37}** We did not, however, abandon Miller in its entirety. The court in *Hoover* went on to adopt Miller's reasoning that "amendments which do not *vitally alter* the substance of a bill do not trigger a requirement for three considerations anew of such amended bill." (Emphasis added.) *Hoover, supra*, 19 Ohio St.3d at 5, 19 OBR at 4, 482 N.E.2d at 579. See, also, *ComTech Systems, Inc. v. Limbach* (1991), 59 Ohio St.3d 96, 570 N.E.2d 1089.

**{¶ 38}** Thus, this court, in considering the validity of a legislative enactment, no longer shows complete deference to the legislative journals with respect to the issue of compliance with the three-consideration requirement. The facts in *Hoover* demonstrate a bill that was in fact "wholly changed." We feel that a more demanding constitutional test is one that examines whether a bill was "vitally altered," departing entirely from a consistent theme. We therefore hold that a legislative Act is valid if the requisite entries are made in the legislative journals and there is no indication that the *subject matter of the original bill was "vitally altered"* such that there is no longer a common purpose or relationship between the original bill and the bill as amended.

**{¶ 39}** On their face, the journals indicate three readings of Am.Sub.H.B. No. 107 in both chambers, albeit the final version was reread just once in each. Am.Sub.H.B. No. 107 was in fact substantially amended at every step in the proceedings. In the House, the committee reviewing the bill added several substantive amendments to original appropriations provisions, and three more amendments were made from the floor. In the Senate, the Senate Commerce and Labor Committee incorporated the provisions from a related appropriations bill and a bill that significantly revised the underlying substantive law sections.[2] Six additional amendments were approved on the Senate floor. Then, Am.Sub.H.B.

---

2. We give no effect to relators' suggestion that the fact that the bill was sent to the Senate Commerce and Labor Committee instead of the Senate Finance Committee indicates bad faith on the Senate's part.

No. 107 was substantially amended once again in the conference committee to which it was referred before finally being passed by both houses.

{¶ 40} The difference between a valid bill that is heavily amended, however, and an invalid one that is "vitally altered," as relators would have us interpret the phrase, is one of degree. Section 15(A), Article II of the Ohio Constitution reserves to each house the right to freely alter, amend or reject bills introduced by either.[3] This court would be setting dangerous and impracticable precedent if it undertook a duty to police any such difference of degree.

{¶ 41} Instead, we must look to the underlying purpose of the three-consideration provision. As articulated by Justice Douglas in his concurring opinion in *Hoover*, "the purpose of the 'three reading' rule is to prevent hasty action and to lessen the danger of ill-advised amendment at the last moment. The rule provides time for more publicity and greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with his or her constituents, note the comments of the press and become sensitive to public opinion." *Id*., 19 Ohio St.3d at 8, 19 OBR at 7, 482 N.E.2d at 582 (Douglas, J., concurring).

{¶ 42} Unlike the situation in *Hoover* where the entire contents of the original bill were removed and replaced by a totally unrelated subject, we are dealing here with a bill that has been heavily amended and yet retains its common purpose to modify the workers' compensation laws. Furthermore, both houses deliberated upon Am.Sub.H.B. No. 107 and its amendments for several months. Hearings were held and the issues were openly debated. The Governor stimulated the debate by announcing in the press that he would veto any appropriations bill that did not also substantially reform the underlying workers' compensation

---

3. Section 15(A), Article II states in part: "Bills may originate in either house, but may be altered, amended, or rejected in the other."

system. It would be difficult to characterize this activity as "hasty action" that precipitated "ill-advised amendment at the last moment."

**{¶ 43}** Based on the foregoing, we decline to extend the *Hoover* analysis to the bill before us and declare the bill unconstitutional. To do otherwise would place this court in the position of directly policing every detail of the legislative amendment process when bills are passed containing a consistent theme.

**{¶ 44}** Accordingly, we deny relators' requests for a writ of mandamus on the issue of whether Am.Sub.H.B. No. 107 violates the three-consideration provision of Section 15(C), Article II of the Ohio Constitution.

III

**{¶ 45}** Relators in case No. 93-2057 argue in their second proposition of law that the enactment of Am.Sub.H.B. No. 107 unconstitutionally deprived the citizens of Ohio of their right of referendum. We agree, and in so doing overrule our decision in *State ex rel. Riffe v. Brown* (1977), 51 Ohio St.2d 149, 5 O.O.3d 125, 365 N.E.2d 876.

**{¶ 46}** Section 1, Article II of the Ohio Constitution reserves to the people of this state the power of referendum, a power which serves as a check on the General Assembly by permitting laws or parts of laws passed by that body to be submitted to the voters for approval or rejection. Section 1, Article II provides in part:

"[T]he people reserve to themselves the power to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls on a referendum vote as hereinafter provided. They also reserve the power to adopt or reject any law, section of any law or any item in any law appropriating money passed by the general assembly, except as hereinafter provided * * *."

Section 1c, Article II of the Ohio Constitution further describes the power of referendum:

"[T]he signatures of six per centum of the electors shall be required upon a petition to order the submission to the electors of the state for their approval or rejection, of any law, section of any law or any item in any law appropriating money passed by the general assembly. No law passed by the general assembly shall go into effect until ninety days after it shall have been filed by the governor in the office of the secretary of state, except as herein provided. When a petition, signed by six per centum of the electors of the state and verified as herein provided, shall have been filed with the secretary of state within ninety days after any law shall have been filed by the governor in the office of the secretary of state, ordering that such law, section of such law or any item in such law appropriating money be submitted to the electors of the state for their approval or rejection, the secretary of state shall submit to the electors of the state for their approval or rejection such law, section or item, in the manner herein provided, at the next succeeding regular or general election in any year occurring subsequent to sixty days after the filing of such petition, and no such law, section or item shall go into effect until and unless approved by a majority of those voting upon the same. If, however, a referendum petition is filed against any such section or item, the remainder of the law shall not thereby be prevented or delayed from going into effect."

{¶ 47} The power of referendum, however, is not absolute. Section 1d, Article II of the Ohio Constitution limits the power of referendum by providing that certain laws are not subject to referendum:

"Laws providing for tax levies, appropriations for the current expenses of the state government and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect. * * * The laws mentioned in this section shall not be subject to the referendum." (Emphasis added.)

{¶ 48} The court in *Riffe* addressed the right of referendum in a case similar to the cases before us today. In *Riffe*, Sections 1 and 2 of the bill altered the

substantive law related to voting and election procedures; and Section 5 provided an appropriation for the current expenses of the Secretary of State. After the bill was filed in the office of the Secretary of State, the Secretary of State, in his acknowledgement of the filing, indicated that Section 5—the appropriation provision—was effective on the date the Governor had signed the bill. The Secretary of State also indicated, however, that Sections 1 through 4 would not become effective until ninety days after the date on which the bill had been filed in the Secretary of State's office, thereby giving the citizens of Ohio an opportunity to submit a petition for a referendum on those sections.

{¶ 49} Relators in Riffe filed a complaint against respondent, the Secretary of State, seeking an order from this court granting writs of mandamus and prohibition directing the Secretary of State to give immediate effect to the entire bill.

{¶ 50} The court granted relators' request for a writ of mandamus, holding that the entire bill took immediate effect because one part of the bill contained an appropriation for the current expenses of the state government, a provision that pursuant to Section 1d, Article II of the Ohio Constitution takes effect immediately and is not subject to a referendum. The court reasoned that because part of the bill contained such a provision, the remaining parts of the bill, which otherwise would be subject to a referendum, "must necessarily share [the] constitutionally imposed disability." *Riffe, supra*, 51 Ohio St.2d at 154, 5 O.O.3d at 128, 365 N.E.2d at 879-880.

{¶ 51} Chief Justice O'Neill and Justices Herbert and Paul W. Brown dissented. In his dissent, Chief Justice O'Neill stated that "[t]he language of Section 1c [Article II] providing that 'such law, section of such law or any item in such law appropriating money be submitted to the electors of the state for their approval or rejection * * *' establishes unequivocally that an Act *need not necessarily have a single effective date*." (Emphasis added.) *Id.* at 163, 5 O.O.3d

at 133, 365 N.E.2d at 884. He further stated that "[i]n all previous cases involving Section 1d exceptions this court has recognized that *the right of referendum attaches to each section of the law not specifically falling within Section 1d*." (Emphasis added.) *Id*. at 164, 5 O.O.3d at 133, 365 N.E.2d at 884-885.

{¶ 52} We find the reasoning of Chief Justice O'Neill compelling and agree with him that the decision in *Riffe* "emasculate[s] the constitutional right of electors of Ohio to a referendum." *Id*. at 162, 5 O.O.3d at 132, 365 N.E.2d at 883. We therefore overrule our decision in *Riffe* and adopt the holding proposed by Chief Justice O'Neill, which states:

"Any section of a law which changes the permanent law of the state is subject to referendum under the powers reserved to the people by Section 1 of Article II, even though the law also contains a section providing for an appropriation for the current expenses of the state government and state institutions which under Section 1d, Article II, becomes immediately effective." *Id*., 51 Ohio St.2d at 167, 5 O.O.3d at 135, 365 N.E.2d at 886.

{¶ 53} We are mindful that in the case before us today the General Assembly did provide for a ninety-day delay before the nonappropriation provisions of Am.Sub.H.B. No. 107 would take effect. Our decision in *Riffe*, however, appears to have foreclosed any meaningful opportunity for the citizens of this state to circulate a petition for a referendum on Am.Sub.H.B. No. 107. We therefore stay the nonappropriation provisions of Am.Sub.H.B. No. 107 for a period of ninety days from the date of this decision. During this ninety-day period, relators may undertake to submit to the Secretary of State a petition for a referendum on the provisions of Am.Sub.H.B. No. 107 that change the permanent law of the state. Of course, no referendum is available for the provisions appropriating money for the current expenses of the state government. Thus, we grant relators' request for a writ of mandamus on the issue of whether Am.Sub.H.B. No. 107 violates the right of referendum under Section 1, Article II of the Ohio Constitution.

IV

**{¶ 54}** Relators in case No. 93-2057 argue that by abolishing the existing Industrial Commission and establishing a new commission, the legislature (1) engaged in an impermissible subterfuge, and (2) violated the doctrine of separation of powers by interfering with the authority of a quasi-judicial body. Relator in case No. 93-2059 adds that the legislation deprived the members of the old commission of their employment in violation of their right to due process of law under the federal and state Constitutions. We disagree with each of these assertions, and therefore deny relators' requests for writs of mandamus, prohibition and quo warranto with respect to these issues.

**{¶ 55}** Relators argue that the enactment of Am.Sub.H.B. No. 107 was a subterfuge because it was done "solely for the purpose of replacing the current members [of the Industrial Commission] with new ones." To support their contention, relators cite a court of appeals decision from this state which defined "subterfuge" in the civil service context as follows:

**{¶ 56}** "The test of subterfuge in the abolishment of a position is: if another is employed to perform substantially identical service, either under the same or a different title, the purported abolishment is a subterfuge; if another is not so employed, the position has been legally abolished and it is not a subterfuge." *State ex rel. Dahmen v. Youngstown* (1973), 40 Ohio App.2d 166, 69 O.O.2d 171, 318 N.E.2d 433, paragraph four of the headnotes.

**{¶ 57}** Relators argue that the General Assembly did not abolish the Industrial Commission but instead simply removed the members from the commission and replaced them with new members, who were to perform the same tasks.

**{¶ 58}** We do not agree that the General Assembly engaged in a subterfuge under either the test proposed by relators or any other test. The enactment of Am.Sub.H.B. No. 107 does not simply replace the former members of the Industrial

18

Commission with new members but instead creates a new commission that is substantially different from the old.

{¶ 59} Am.Sub.H.B. No. 107 reduces the number of members of the Industrial Commission from five to three and changes the procedure by which the members are selected. Before the enactment of Am.Sub.H.B. No. 107 the Governor had broad authority under R.C. 4121.02 to appoint members to the Industrial Commission without any restriction imposed by an outside body. Am.Sub.H.B. No. 107 changes the selection process by limiting the Governor's powers of appointment. Am.Sub.H.B. No. 107 enacts a new statute, R.C. 4121.04, which creates a ten-member Industrial Commission Nominating Committee composed of representatives of employers, labor and the public. The nominating committee, eight of whose members are appointed by the Governor from lists submitted by the Ohio Federation of Labor and representatives of Ohio industry, makes recommendations to the Governor for the appointment of members to the commission. Under newly enacted R.C. 4121.02(D), the Governor must then appoint commission members from those individuals recommended by the nominating committee.

{¶ 60} Am.Sub.H.B. No. 107 also changes the powers and duties of the Industrial Commission. The bill amends R.C. 4121.121 by transferring from the Industrial Commission to the Bureau of Workers' Compensation the authority to process applications for final settlements of claims or benefits in cases that involve state fund employees and employers. The bill amends R.C. 4121.35 by transferring from the commission to the bureau the authority to establish specific safety codes. Under amended R.C. 4123.417, the commission no longer has authority over the Disabled Workers' Relief Fund. These are but three of the changes made. Relators in case No. 93-2060 summarize the extent of the changes to the commission by stating that "the Conference Bill sharply limits the responsibilities of the Industrial Commission of Ohio * * *."

**{¶ 61}** Based on the above, it is clear that the General Assembly's purpose in enacting Am.Sub.H.B. No. 107 was to do more than simply replace the members of the Industrial Commission with new members. Accordingly, relators' argument that the enactment of Am.Sub.H.B. No. 107 was a subterfuge is without merit.

**{¶ 62}** Relators further maintain that the enactment of Am.Sub.H.B. No. 107 violates the constitutional doctrine of separation of powers, citing in support of their contention *Humphrey's Executor v. United States* (1935), 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611. Relators argue that "[p]ermitting the legislature to terminate and recreate a commission such as the Industrial Commission gives the legislature a 'coercive influence' which 'threatens the independence of a commission, * * *' " quoting *Humphrey's Executor, supra*, at 630, 55 S.Ct. at 875, 79 L.Ed. at 1620. Relators conclude that allowing the legislature to have such power interferes with the commission's ability to make fair and impartial decisions.

**{¶ 63}** We find relators' reliance on *Humphrey's Executor* misplaced. In *Humphrey's Executor*, the Supreme Court upheld the authority of Congress to create a quasi-judicial agency, the Federal Trade Commission, and to limit the removal of its members by the President for cause. *Humphrey's Executor* establishes the authority of the Congress to limit the power of the executive branch to remove members from a quasi-judicial agency created by Congress. The case does not stand for the broad proposition that an agency, once created, must be free from any interference in its decisionmaking (assuming, of course, that the mere act of restructuring a commission would somehow interfere with its decisionmaking ability). Nor does the case limit the power of Congress—and, by analogy, the General Assembly—to restructure an agency it has created.

**{¶ 64}** Moreover, Section 35, Article II of the Ohio Constitution expressly grants to the General Assembly the power to pass, inter alia, laws establishing a state fund for workers' compensation cases, laws related to the administration of those funds, and laws establishing a board to oversee the workers' compensation

system. And Section 27, Article II of the Ohio Constitution grants authority to the General Assembly to establish the manner in which members of state offices are appointed. Given these grants of authority, we fail to see how the enactment of Am.Sub.H.B. No. 107 amounts to either an unconstitutional "coercive influence" by the General Assembly over the Industrial Commission or an unconstitutional encroachment on the authority of the executive branch.[4]

{¶ 65} Finally, relator in case No. 93-2059 argues that the commission members have a property interest in their employment and that the General Assembly cannot take that interest from them except by due process of law. Relator contends that, as public officials, the commission members have a property interest in their position similar to the property interest held by classified civil servants in their employment.

{¶ 66} We hold that relator's due process argument is totally without merit on the authority of our decisions in *State ex rel. Herbert v. Ferguson* (1944), 142 Ohio St. 496, 27 O.O. 415, 52 N.E.2d 980, and *State ex rel. Trago v. Evans* (1957), 166 Ohio St. 269, 2 O.O.2d 109, 141 N.E.2d 665. In *Herbert*, we defined "public office" as "a charge or trust conferred by public authority for a public purpose, with independent and continuing duties, involving in their performance the exercise of some portion of the sovereign power." *Id*., 142 Ohio St. at 501, 27 O.O. at 417, 52 N.E.2d at 983. In *Trago*, we held that "[p]ublic offices are held neither by grant nor contract, and no person has a vested interest or private right of property in them." Id. at paragraph one of the syllabus.

{¶ 67} The Industrial Commission exercises sovereign state power by virtue of its authority to exercise the quasi-judicial function of adjudicating claims.

---

4. See, also, *Thornton v. Duffy* (1918), 99 Ohio St. 120, 124 N.E. 54, in which we held that "[t]he enactment of the Workmen's Compensation Law * * * did not exhaust the authority conferred upon the generaal asembly of Ohio by Section 35 of Article II of the Constitution. On the contrary, *it has the power to amend or repeal all or any portion thereof at any time it deems proper*." (Emphasis added.) *Id*. at paragraph one of the syllabus.

Under former R.C. 4121.03(F), the commission "is responsible for the adjudication of claims * * *." Under newly enacted R.C. 4123.511(E), the commission has authority to hear appeals of cases. Because they exercise sovereign power in this regard, the members of the commission hold a public office, an office which pursuant to our decision in Trago, supra, confers upon them no property right. As a result, we find that the 1993 enactment of Am.Sub.H.B. No. 107 does not deprive any member of the former Industrial Commission of his right to due process of law.

{¶ 68} We deny all requests for writs of mandamus and prohibition on the issues addressed in Part IV of this opinion.

V

{¶ 69} In case No. 93-2059 relator asserts that the Governor violated his duty under former R.C. 4121.02(E) by failing to grant relator an annual salary increase of five percent. Appointed as the public member of the Industrial Commission, relator has received no increase in salary since his appointment was effective on July 1, 1991. He seeks a writ of mandamus to compel payment of two five-percent salary increases.

{¶ 70} Former R.C. 4121.02(E) directed the Governor to grant each member of the commission "an annual salary increase based upon the average salary increases of other department directors for that year, not to exceed five per cent per year." 143 Ohio Laws, Part II, 3265. Because the average of all salary increases given to directors in 1993 exceeded five percent, relator asserts he is entitled to the maximum five percent permitted under former R.C. 4121.02(E).

{¶ 71} While respondents concede relator's right to a salary increase, they argue that the use of mandamus to obtain this relief is improper. Respondents assert that where relator could bring an action at law, such as an action for money damages, mandamus cannot be employed as a substitute, citing *Maloney v. Sacks* (1962), 173 Ohio St. 237, 19 O.O.2d 51, 181 N.E.2d 268.

**{¶ 72}** The general rule stated in *Maloney*, however, does not apply to public employees. Rather, in *State ex rel. Fenske v. McGovern* (1984), 11 Ohio St.3d 129, 11 OBR 426, 464 N.E.2d 525, paragraph three of the syllabus, this court held that "[t]he ministerial act of making payment of money due a public employee may be compelled by mandamus where the public employee has a clear legal right to payment of the compensation and the respondent public officer has a clear legal duty to perform the ministerial task of making such payment."

**{¶ 73}** Thus we find in this case that mandamus is an appropriate remedy to compel payment of the salary increase to which relator is entitled.

**{¶ 74}** We therefore grant relator's request for a writ of mandamus on the issue of whether he is entitled to receive a salary increase.

VI

**{¶ 75}** All other requests for writs of mandamus, prohibition and quo warranto that are not specifically granted in this opinion are denied.

*Judgment accordingly.*

DOUGLAS and RESNICK, JJ., concur separately.

PFEIFER, J., concurs separately.

MOYER, C.J., concurs in part and dissents in part.

A.W. SWEENEY, J., concurs in part and dissents in part.

F.E. SWEENEY, J., dissents in part and concurs in part.

———————————

**DOUGLAS, J., concurring.**

**{¶ 76}** I reluctantly concur with the majority. I write separately to, in part, explain my position and to, in part, respond to the dissents. The majority finds that Am.Sub.H.B. No. 107 " * * * violates the one-subject rule of Section 15(D), Article II of the Ohio Constitution, *but the violation is remedied by the severance of the child labor exemption provision of R.C. 4109.06 and the workplace intentional tort provision of R.C. 2745.01 from the bill * * *.*" (Emphasis added.) What is the

majority's justification for proceeding in this manner? The answer is found in State ex rel. *Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 580 N.E.2d 767.

{¶ 77} In *Hinkle*, we considered the constitutionality of Am.Sub.H.B. No. 200. The allegation made in *Hinkle* was that the bill violated the one-subject rule which prohibits disunity of subjects. The bill in question contained matters pertaining to the state judicial system (creating new courts, new judgeships, etc.) and a provision defining the term "residence district" in the liquor control law for the purpose of exercising the local option privilege. In finding that the bill violated the one-subject rule, the majority, in *Hinkle*, found that "[t]o say that laws relating to the state judiciary and local option have elections in common is akin to saying that securities laws and drug trafficking penalties have sales in common—the connection is merely coincidental." *Id*. at 148, 580 N.E.2d at 770.

{¶ 78} The majority, in *Hinkle*, up to that point, was correct and, further, was correct when it quoted from *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 145, 11 OBR 436, 440, 464 N.E.2d 153, 157, that " ' * * * [a]n absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining * * * provisions in one act * * * [strongly suggest] that the provisions were combined for tactical reasons, i.e., logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purposes of the rule.' "

{¶ 79} The majority, in *Hinkle*, was still correct when it said that "Am.Sub.H.B. No. 200 falls within this language [*Dix* language] and, therefore, violates Section 15(D), Article II of the Ohio Constitution * * *." *Id*., 62 Ohio St.3d at 149, 580 N.E.2d at 770. But the majority, in *Hinkle*, did not stop there. It added, " * * * to the extent that the bill incorporates Section 7. Accordingly, we sever the offending portion of the bill * * *." *Id*. For this new constitutional reconstruction,

24

the majority, in *Hinkle*, then cited *Livingston v. Clawson* (1982), 2 Ohio App.3d 173, 2 OBR 189, 440 N.E.2d 1383, and continued, " * * * to cure the defect and save the portions of Am.Sub.H.B. No. 200 other than Section 7 which do relate to a single subject." *Id*. The fact is, however, that Livingston had nothing to do with Section 15(D), Article II of the Ohio Constitution.

{¶ 80} I dissented in *Hinkle*, stating, in part, that "[t]he majority should remember that this opinion [*Hinkle* ] will be the basis upon which bills that violate the one-subject rule will be judged in the future. *It will be a race to this court by parties seeking to uphold their portion of a bill* while asking us to find another portion of the bill unconstitutional, when the one-subject rule is violated. Who is to choose the more favored provision(s)? Why the Justices, of course. How can there be any certainty or reliability when such a procedure is followed?" (Emphasis added.) *Hinkle*, 62 Ohio St.3d at 153, 580 N.E.2d at 773.

{¶ 81} Today's decision carries out that prediction and confirms that fear. As my dissent in *Hinkle* went on to say, " * * * how does the majority know which part of the Act is defective? The Act is a promulgation of the General Assembly in package form. Can we break into the package and excise what *we* perceive (or want to be) the offending part?" (Emphasis added.) *Id*.

{¶ 82} In *Hinkle*, the majority answered that it could decide which parts of an offending Act should be saved even though *Dix, supra*, very clearly said that " * * * an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purposes of the rule." (Emphasis added.) *Dix*, 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157. Note, *Dix* says the Act— not just part of the Act—must be held to be invalid.

{¶ 83} Notwithstanding all this, the majority, in *Hinkle*, exercised its power (judicial legislation?) and found severability to be the order of the day. *Hinkle* was bad law when it was decided—and it is bad law now. But it is the law and it must be followed until overruled. I am prepared to do just that—overrule *Hinkle*.

**{¶ 84}** Not surprisingly, the dissents make only a passing reference to *Hinkle*. The rambling dissent, authored by my valued colleague Justice A.W. Sweeney, who, incidentally, concurred in *Hinkle*, now seems to disapprove of *Hinkle* when, in his dissent, he states that he now believes that " * * * it makes abundantly more sense for this court to reevaluate the wisdom of *Hinkle*, supra, and admit error * * *." This apparent deathbed conversion is welcome but, obviously, falls far short of voting to overrule Hinkle. If Justice A.W. Sweeney wants to overrule Hinkle and, thereby, prevent any "excising" of Am.Sub.H.B. No. 107, then I agree, but he should recognize that such an action then invalidates the entire Act including the appropriation provisions. Under existing law, he cannot have it both ways.

**{¶ 85}** Justice Sweeney then cites *Hoover v. Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St.3d 1, 19 OBR 1, 482 N.E.2d 575, and says that " * * * Hoover * * * undoubtedly compels that the entire legislation be invalidated * * *." Given *Hinkle*, *Hoover*, of course, stands for no such proposition!

**{¶ 86}** *Hoover*, in major part, deals with the "three-reading" rule of Section 15(C ), Article II of the Ohio Constitution. See *Hoover* syllabus. Where *Hoover* deals with Section 15(D ), Article II of the Ohio Constitution, the one-subject rule, it does so in language inapposite to Justice A.W. Sweeney's statement about *Hoover*. *Hoover, supra*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580, says, "[a]s we emphasized in *Dix*, every presumption in favor of the enactment's validity should be indulged. The mere fact that a bill embraces *more than one topic is not fatal, as long as a common purpose or relationship exists between the topics*." (Emphasis added.) Neither dissent, of course, points out how the Act in question, "excised" in part by the majority, now contains more than one topic nor does either dissent set forth how the remainder of the Act fails in "a common purpose or relationship * * * between * * * topics." Justice A.W. Sweeney concurred in Hoover and if he says the case stands for the proposition that "the entire legislation

be invalidated[,]" then he should realize that the entire law has to go—not just everything but the appropriation provisions.

**{¶ 87}** Moving to the dissent of Justice Francis E. Sweeney, Sr., I immediately recognize that my friend and valued colleague was not a member of this court when *Hinkle* was decided. That does not lessen the fact, however, that *Hinkle* is the law on a question which is a subject of his dissent and should, I believe, be followed unless and until it is overruled.

**{¶ 88}** In his dissent, Justice Francis E. Sweeney, Sr. accuses the majority of " * * * wishful thinking, not reasoned analysis." To support this conclusion, Justice Sweeney makes three points.

**{¶ 89}** First, the dissent argues violation of the one-subject rule. I have responded to this argument, *supra*. Additionally, with reference to the "logrolling" argument, "logrolling" by the General Assembly is not constitutionally forbidden in all cases by Section 15(D), Article II. The General Assembly, and properly so, engages in "logrolling" much of the time. The *only* "logrolling" that is constitutionally proscribed is that which results in an Act violating the one subject rule of Section 15(D), Article II. Given the Act as now "excised" by the majority pursuant to the law of *Hinkle*, there is now not more than one subject and thus no prohibited "logrolling."

**{¶ 90}** Second, Justice Sweeney argues that " * * * there is no necessary or logical relationship between the substantive provisions of Am.Sub.H.B. No. 107 and the nature and amounts of the appropriations for the bureau provided in that legislation." It is his thesis that combining an appropriation measure with substantive provisions of law also brings about a violation of the one-subject rule. Again, no case law is cited for this proposition. I believe the case law and learned legal commentary are to the contrary.

**{¶ 91}** Justice Sweeney cites *Dix, supra*, and Professor Ruud's article, "No Law Shall Embrace More Than One Subject" (1958), 42 Minn.L.Rev. 389. What

Dix, supra, 11 Ohio St.3d at 146, 11 OBR at 441, 464 N.E.2d at 158, really said was that "[t]he appropriation in Am.Sub.S.B. No. 227 funds directly the operations of programs, agencies, and matters described elsewhere in the bill. * * * The appropriation is simply the means by which the act is carried out, *and the inclusion of such an appropriation does not destroy the singleness of the subject and the one-subject rule is not violated*." (Emphasis added.)

{¶ 92} Obviously, the foregoing does not support the position taken by the dissents. Neither does Professor Ruud. In the article, the professor said, "[t]here seems to be *no serious contention* that an appropriation is in itself a second subject; therefore, an act may, for example, establish an agency, set out the regulatory program, and make an appropriation for the agency without violating the one-subject rule." (Emphasis added.) Ruud, supra, at 441. Thus, it is clear that combining an appropriation measure with substantive provisions of law does not violate the one-subject rule.

{¶ 93} Third, Justice Sweeney persuasively argues that the Act, as passed, violated the three-consideration provision of Section 15(C), Article II of the Ohio Constitution. Considering all the machinations that went into enacting this legislation, Justice Sweeney may be right. Unfortunately, the *law* does not support his position and that, again, may be the reason none is cited. I have reviewed the pertinent provisions of the Constitution, the journal of the Senate, the journal of the House of Representatives and the case law.

A. *The Constitution—Section 15(C), Article II*

{¶ 94} Section 15(C), Article II of the Ohio Constitution states, in part, that "[e]very bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house * * *."

**{¶ 95}** The Journal of the Senate of June 23, 1993, reflects that "Sub.H.B. No. 107 * * * *relative to the workers' compensation laws* and to make appropriations for the Industrial Commission and the Bureau of Workers' Compensation for the biennium beginning July 1, 1993, and ending June 30, 1995 was considered the third time." (Emphasis added.) The Journal of the House of Representatives of June 9, 1993, reflects that: "*Sub.H.B. No. 107*—Representative Sweeney. To amend sections 109.84 * * * and to repeal sections 4123.441 and 4141.48 of the Revised Code *relative to the Workers' Compensation Laws* and to make appropriations for the Bureau of Workers' Compensation for the biennium beginning July 1, 1993, and ending June 30, 1995, was *taken up for consideration the third time*." (Emphasis added.) The journals of both houses could not be more clear as to what was considered and how many times the subject matter was considered!

B. *The Constitution—Section 15(E), Article II*

**{¶ 96}** Section 15(E), Article II of the Ohio Constitution states that "[e]very bill which has passed both houses of the general assembly shall be signed by the presiding officer of each house to certify that the procedural requirements for passage have been met and shall be presented forthwith to the governor for his approval." The signatures of the Senate President and the Speaker of the House appear on the bill in question and meet this certification requirement.

C. *The Case Law*

**{¶ 97}** As to the signatures of the presiding officers of both houses and the effect of those signatures, this court in *Maloney v. Rhodes* (1976), 45 Ohio St.2d 319, 74 O.O.2d 499, 345 N.E.2d 407, paragraph three of the syllabus, said: "A law enacted by the passage of a bill by both Houses of the General Assembly by the required majority vote and signed by the Governor (Section 16, Article II of the Ohio Constitution) is *constitutionally invalid* where it does not contain the signatures of the presiding officers of both the House and the Senate 'to certify that

the procedural requirements for passage have been met.' Section 15(E), Article II, Ohio Constitution." (Emphasis added.) Thus, it follows that where the bill is properly signed by the presiding officers of each house, the bill is constitutionally valid in complying with all the procedural requirements for passage.

{¶ 98} Further, in *Hoover, supra*, 19 Ohio St.3d at 4, 19 OBR at 3, 482 N.E.2d at 578, in reference to Section 15(C), we said that, "[t]hus, by constitutional mandate, there now exists an inherently reliable immediate source [the journals] by which the legislature's compliance may be readily ascertained without any undue judicial interference. As a result of the new provision, there is *no need to look anywhere but at the journals* to determine whether the proper procedure has been followed." (Emphasis added.) There can be no question in this case that the journals of both houses say Am.Sub.H.B. No. 107 was given consideration three times. Also, in *State ex rel. Herron v. Smith* (1886), 44 Ohio St. 348, 7 N.E. 447, paragraph one of the syllabus, this court held that the authenticity of a House journal cannot be impeached by parol evidence.

{¶ 99} Additionally, in *ComTech Systems, Inc. v. Limbach* (1991), 59 Ohio St.3d 96, 100, 570 N.E.2d 1089, 1093-1094, we said " * * * that the court need look only at the journals to determine whether the proper procedure [re three-consideration rule] had been followed. This has long been the rule in Ohio. * * * Thus, if the legislative journal records that the legislative body considered the bill on three different days, the legislative body did so." This pronouncement could not be more clear. Justice A.W. Sweeney concurred in *ComTech Systems*.

{¶ 100} Whether or not I might, on the merit question, like to come to some other conclusion is not the issue. The law is clear and unless and until a majority of this court are prepared to overrule *Hinkle*, all the law on this subject mandates that we find that Am.Sub.H.B. No. 107, as excised by the majority and including a referendum provision, is not unconstitutional. Given our oath to uphold the Constitution and to follow the law, I do not see how any other conclusion can be

reached. I would hope that all interests would want and expect us in every case to follow the law wherever it leads.

{¶ 101} Finally, it should be remembered that this case only decides the procedure of enactment. The *merits* (or demerits) of the legislation can still be brought before this court as actual or perceived wrongs occur.

{¶ 102} For all the foregoing reasons, I must concur in the majority opinion. RESNICK, J., concurs in the foregoing opinion.

———————

**ALICE ROBIE RESNICK, J., concurring.**

{¶ 103} I concur in the majority opinion, but with strong reservations. The manner in which the provisions of S.B. No. 152 were united with those of Am.Sub.H.B. No. 107 is extremely questionable legislative activity. It is not, however, the role of this court to function as the Supreme General Assembly.

{¶ 104} It cannot be said that appropriations for the workers' compensation system and provisions for the operation of that system involve more than one subject—both are concerned with the workers' compensation system of Ohio. However, it is clear that the subjects of intentional tort and child labor encompass additional subjects outside the workers' compensation area and therefore cannot be included without violating the one-subject rule.

{¶ 105} In *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 580 N.E.2d 767, this court provided the authority to sever violating portions of an Act while holding the remaining portions constitutional, so that the Act as "cured" is in compliance with the one-subject rule. We are constrained to follow *Hinkle* until it is overruled.

{¶ 106} My primary reservation pertains to the three-reading requirement, but after the violation of the one-subject rule has been cured by following *Hinkle*, the record evinces that the three-reading requirement has also been met. Since we

are not dealing with the merits or substance of Am.Sub.H.B. No. 107, I reservedly concur with the majority and concur in the well-reasoned concurring opinion of Justice Douglas.

DOUGLAS, J., concurs in the foregoing opinion.

———————————

**PFEIFER, J., concurring.**

{¶ 107} "There are more things in heaven and earth, Horatio,/Than are dreamt of in your philosophy." Hamlet, Act I, Scene v, 166. Indeed, the relators and this court merely scratch the surface in discussing the constitutional implications of the passage of this piece of legislation. All of our naive nitpicking only obscures the true affront to the Constitution that workers' compensation legislation historically represents.

I

{¶ 108} The majority opinion does effectively and pragmatically resolve the legitimate constitutional concerns raised by relators. My only quarrel with the majority opinion is its citation of *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 149, 580 N.E.2d 767, 770, to support the severing of the intentional tort and child labor provisions from the bill.

{¶ 109} The present case and its factual context—rather than *Hinkle*—should set the standard for severability. This case is clear—Am.Sub.H.B. No. 107 was always principally about the structural reform of Ohio's workers' compensation system. The unrelated "add-ons" are easy to identify. *Hinkle*, on the other hand, expects members of this court to be wiser than Solomon—to determine, whenever a bill has more than one subject, which portion of the bill is worthy of salvation. Direct personal knowledge tells me that this court severed the wrong portion of the bill in Hinkle—the unrelated legislative "add-ons" are what the court kept intact. To continue to follow Hinkle is to enter into judicial quicksand, and

engage in the folly of believing that we can divine the most deserving of the legislature's actions.

{¶ 110} Therefore, I would have held that this case sets the high water mark for severability cases. Only in cases this plain—and there will not be many—should this court save portions of multi-subject bills.

## II

{¶ 111} The true affront to the Constitution in this area of the law has historically been and continues to be not in how many readings the bill is given or how many things are attached to it, but in how the legislation is created. The legislative process has never flourished in this area. Workers' compensation legislation is historically brokered legislation, designed and agreed upon by interested parties, and not by the one hundred thirty-two elected representatives who make up the General Assembly. Once appropriately blessed, the legislation suddenly descends from on high, and the vast majority of legislators respond with an unquestioning acceptance, as if they had personally been handed the Ten Commandments by Moses himself.

{¶ 112} The offshoot of this flawed process is our flawed workers' compensation system. It is not the result of the legislature working its will over time, but is instead the result of the changing wills of the most powerful interested parties. Legislators who would have valuable, incisive input simply lie down and accept the brokered result.

{¶ 113} While these inner workings never appear in the legislative journals, they are far more insidious and damaging than the claimed violations of the Constitution in this case.

———————————

**MOYER, C.J., concurring in part and dissenting in part.**

{¶ 114} I concur in the majority opinion, except that I believe there exists a sufficient common purpose or relationship between the child labor exemption

provision of R.C. 4109.06, the workplace intentional tort provision of R.C. 2745.01 and the balance of Am.Sub.H.B. No. 107. Therefore, these provisions should also be upheld.

{¶ 115} The majority concedes that the child actor exemption and the law of workers' compensation share a common theme of employment, but the majority narrowly construes Section 15, Article II of the Ohio Constitution to prohibit the inclusion of the provisions in the same legislation. The commonality of the subjects goes beyond mere compensation for injuries; the subjects also have a shared purpose of employment safety. I would not construe the one-subject rule so strictly in this context.

{¶ 116} As to workplace intentional torts, I do not believe the inclusion of this provision in legislation altering workers' compensation laws is constitutionally infirm. In the present context, our inquiry is not narrowly confined to a determination of whether an intentional tort arises out of any employment relationship, but whether there is a sufficient nexus between the two to ascribe a common purpose or relationship to them. I believe such a relationship exists. Both address the compensation of injured workers—one by statute and one by common law. An action sounding in intentional tort represents an exception to the exclusivity rule of workers' compensation. *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489. The parameters of a workplace intentional tort are directly set by the law of workers' compensation. One is an outgrowth of the other.

{¶ 117} For the foregoing reasons, I concur in the majority's opinion, except to the extent that it strikes the aforementioned provisions from Am.Sub.H.B. No. 107.

_____

**A.W. SWEENEY, J., concurring and dissenting.**

{¶ 118} In my view, the 1993 enactment of Am.Sub.H.B. No. 107 clearly violates the one-subject rule of the Ohio Constitution, and the majority seriously errs in arbitrarily upholding portions of that legislation since the General Assembly's attempt at "logrolling" constituted what was plainly a gross violation of the one-subject rule. While our prior decision in *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 149, 580 N.E.2d 767, 770, appears to permit severing "the offending portion of the bill," the instant cause amply illustrates the malleability as well as the undesirability of such a standard. Notwithstanding the fact that *Hinkle* ultimately held that the entire legislation violated the one-subject rule, *id.*, 62 Ohio St.3d at 151, 580 N.E.2d at 771, the severability language within that opinion creates uncertainty and promotes arbitrary and uneven enforcement of Section 15(D), Article II of the Ohio Constitution. The majority's attempt to rationalize its judicial craftsmanship is unpersuasive and thus leads me to conclude that the severability aspect of *Hinkle* must be rejected in favor of the unmistakable standard adopted by this court in *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153.

{¶ 119} In this vein, unlike the concurring opinion of my esteemed colleague, Justice Andy Douglas, I believe it makes abundantly more sense for this court to reevaluate the wisdom of *Hinkle, supra*, and admit error by overruling it, than to essentially embrace all sides of the issue by decrying *Hinkle* as "bad law" in one breath and then join the majority opinion which uses the same "bad law" as the *ratio decidendi* for its holding. The methodology employed by the concurring opinion is akin to assailing the evils of alcohol over a few shots of whiskey. If the concurring opinion truly believes *Hinkle* should be overruled, I believe a clear reading of all the concurring and dissenting opinions in the cause sub judice indicates there is adequate support for such a result. Unfortunately, the undercurrent of all the concurring opinions seems to imply that the severability aspect of Hinkle should be kept alive only until the "preferred portions" of

Am.Sub.H.B. No. 107 survive the compelling constitutional attack raised by relators herein.

{¶ 120} I am also befuddled as to why my learned colleague chooses to equivocate from his prior stand in *Hinkle, supra*, by refusing to dissent to the instant holding. I am disappointed that he fails to dissent from the "bad law" generated by the majority opinion, when in the past he has been a tireless advocate for what he believes and never hesitated to dissent when he felt the majority reasoning was faulty or embraced "bad law." See, e.g., *Hill v. Allstate Ins. Co.* (1990), 50 Ohio St.3d 243, 247, 553 N.E.2d 658, 662 (underinsured motorist coverage); *Rocky River v. State Emp. Relations* Bd. (1988), 39 Ohio St.3d 196, 209, 530 N.E.2d 1, 12 (Collective Bargaining Act); *Taylor v. Academy Iron & Metal Co.* (1988), 36 Ohio St.3d 149, 155, 522 N.E.2d 464, 470 (employer intentional tort); *Crawford v. Euclid Natl. Bank* (1985), 19 Ohio St.3d 135, 143, 19 OBR 341, 347, 483 N.E.2d 1168, 1174 (malicious prosecution).

{¶ 121} In any event, given the magnitude of the General Assembly's violation of the one-subject rule, our prior decision in *Hoover v. Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580, undoubtedly compels that the entire legislation be invalidated: " * * * where there is a blatant disunity between topics and no rational reason for their combination can be discerned, it may be inferred that the bill is a result of log-rolling—the practice by which several matters are consolidated in a single bill for the purpose of obtaining passage for proposals which would never achieve a majority if voted on separately. This is the very practice which Section 15(D) was designed to prevent." Unfortunately, the majority and concurring opinions conveniently ignore this passage from *Hoover*, which follows and tempers the quotation reproduced and highlighted in both opinions.

{¶ 122} For these reasons, and for the cogent reasoning articulated by Justice Francis E. Sweeney, Sr. in his opinion dissenting in part and concurring in part, I would grant all of the requested writs.

_____

**FRANCIS E. SWEENEY, Sr., J., dissenting in part and concurring in part.**

{¶ 123} While I join in the majority's decision in Part V of its opinion that relator in case No. 93-2059 is entitled to a writ of mandamus to compel his right to a salary increase, I agree with little else. Because I believe that the 1993 enactment of Am.Sub.H.B. No. 107 is unconstitutional, I vigorously dissent from the bulk of the majority's opinion.

{¶ 124} Philosophically, the majority's posture and my position are basically the same. The majority readily concedes that Am.Sub.H.B. No. 107 violates the one-subject rule of Section 15(D), Article II of the Ohio Constitution and the right to a referendum as guaranteed by Section 1, Article II of the Ohio Constitution. However, in crafting its remedy, the majority picks and chooses those parts of the bill which it wants to keep. In discarding only two minor provisions, the majority's endeavor to salvage what it admits is an unconstitutional legislative Act is untenable. Because I believe that all the non-appropriations provisions violate the one-subject rule, and the right to a referendum, and that these measures were added at the last minute and then logrolled through both chambers, I cannot join in the majority's decision announced today.

{¶ 125} To really understand what is happening here, it is necessary to stress the facts, many of which were left out of the majority's opinion.

{¶ 126} H.B. No. 107 was introduced in the Ohio House of Representatives on February 4, 1993. H.B. No. 107, as introduced, was a four-page appropriations bill for the current operating expenses for the Bureau of Workers' Compensation for the biennium beginning July 1, 1993, and ending June 30, 1995. The companion bill, H.B. No. 106, provided the biennium funding for the Industrial Commission.

Since the bills were appropriations measures, they were sent to the Finance and Appropriations Committee of the House of Representatives for consideration. When it was reported out of the Finance and Appropriations Committee, Sub.H.B. No. 107 contained a few additional changes. This bill was never considered by the House's Commerce and Labor Committee because there were no significant changes to the workers' compensation system. On June 9, 1993, the House passed the substitute bill, Am.Sub.H.B. No. 107. The next day, this bill was introduced in the Ohio Senate.

{¶ 127} On June 15, 1993, the Senate referred Sub.H.B. No. 107 and Sub.H.B. No. 106 to its Committee on Commerce and Labor instead of to its Finance Committee. The Commerce and Labor Committee had been considering S.B. No. 152, which made extensive and radical changes in the workers' compensation system and procedures. Although the Commerce and Labor Committee had conducted several hearings on this bill, it was going nowhere. However, because Governor Voinovich had announced that he would veto any budget bill which did not include meaningful reform of the workers' compensation law and the budgets for the bureau and commission were due to expire on June 30, 1993, Senate leadership made the decision to amend Sub.H.B. No. 107 to incorporate reform measures contained within S.B. No. 152.

{¶ 128} Thus, on June 23, 1993, the Senate Committee on Commerce and Labor reported back Sub.H.B. No. 107. Am.Sub.H.B. No. 107 as passed by the Senate contained not only the appropriations measures as passed by the House, but now also contained the body of S.B. No. 152 (and Sub.H.B. No. 106).

{¶ 129} When the bill was reported back to it, the House refused to concur with the Senate amendments. The Senate insisted on its version and, as a result, according to the legislative process, the bill was sent to a Conference Committee.

{¶ 130} The Conference Committee made another set of additions to the bill. However, the appropriations measures remained unchanged from the original

version. Hours after the Conference Committee revised the bill, both the Senate and the House passed it.

{¶ 131} Thus, what started as a simple appropriations bill, now contained massive substantive law changes to the workers' compensation system. The magnitude of the changes by the legislation is demonstrated by the Legislative Services Commission Comparison of Current and Prior Workers' Compensation Law and Provisions of Am.Sub.H.B. 107. It takes twenty pages to list the changes made by the bill. The majority's admission that the final version "substantially amended the workers' compensation law" is truly an understatement.

{¶ 132} In effect, the bill transforms the structure of the workers' compensation administration and delivery system. It limits the authority of the Industrial Commission and transfers many of its powers to the Administrator of the Bureau of Workers' Compensation ("bureau"). It eliminates the regional boards of reviews and revamps the entire hearing and appeals procedures.

{¶ 133} The bill limits the rights of injured workers to choose their own doctors, and changes the entire health care delivery system. It provides incentives for prolonged employer resistance to determinations in favor of injured workers by requiring injured workers to pay back awards that are reversed on appeal out of any subsequent claim payments.

{¶ 134} The bill makes numerous other major substantive changes to the workers' compensation system and to other areas of the law. These changes include the privatization of the rehabilitation program and a definition of and standard of proof for intentional tort actions.

{¶ 135} Thus, what began as a simple appropriations bill, saddled now with major workers' compensation reform, became law when Governor Voinovich signed the bill after exercising a line-item veto. With the addition of these facts, it becomes harder to reconcile the majority's results with established case law. I

believe what occurred here is a classic example of the "logrolling" forbidden by the one-subject rule of Section 15(D), Article II of the Ohio Constitution.

{¶ 136} In *Hoover v. Bd. of Franklin Cty. Commrs*. (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580, this court explained the purpose of the one- subject rule and the test by which it is to be enforced:

"Under this court's recent holding in *State ex rel. Dix, v. Celeste* (1984), 11 Ohio St.3d 141 [11 OBR 436, 464 N.E.2d 153], a 'manifestly gross and fraudulent violation' of the one-subject rule contained in Section 15(D) will invalidate an enactment. * * * As we emphasized in *Dix,* every presumption in favor of the enactment's validity should be indulged. The mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics. However, where there is a blatant disunity between topics and no rational reason for their combination can be discerned, it may be inferred that the bill is a result of log-rolling—the practice by which several matters are consolidated in a single bill for the purpose of obtaining passage for proposals which would never achieve a majority if voted on separately. This is the very practice which Section 15(D) was designed to prevent."

{¶ 137} In finding no violation of the one-subject rule after the offending provisions of the child labor exemption and the workplace intentional tort were severed, the majority concludes that there was no need to sever the appropriations bill from the substantive workers' compensation reform bill because appropriations provide a sufficient unity of topics to satisfy Section 15(D). The majority states, "[a]lthough the provisions embrace more than a singular topic, they do have a common purpose: to amend and reform the laws governing the compensation of injured workers and to fund the two agencies that are charged with administering those laws. And they all have a clear common relationship, namely, workers' compensation." This is wishful thinking, not reasoned analysis.

{¶ 138} In support of its holding, the majority relies on *Dix, supra*, and the commentary of Professor Ruud. *Dix* is easily distinguished and Professor Ruud's analysis is supportive of my position that there is a violation of the one-subject rule.

{¶ 139} In *Dix*, it is clear that the General Assembly acted to comprehensively restructure a variety of economic development programs. In order to accomplish this objective, the General Assembly abolished one office, and at the same time created distinctly different offices. Because that legislation involved the creation of new departments within the state government, it was clearly necessary that funds be appropriated for their operation. Under those circumstances, this court concluded: "[a]n examination of the bill demonstrates that the appropriation * * * is simply the means by which the act is carried out," *Dix, supra*, 11 Ohio St.3d at 146, 11 OBR at 441, 464 N.E.2d at 158. Upon these facts, this court found no violation of the one-subject rule.

{¶ 140} However, here, contrary to the majority's position, there is no necessary or logical relationship between the substantive provisions of Am.Sub.H.B. No. 107 and the nature and amounts of the appropriations for the bureau provided in that legislation. If the purpose of combining the appropriations acts with substantive legislation was to assure that appropriations were adjusted as necessary to take into account the fiscal ramifications of substantive changes, it is extremely difficult to account for the fact, as conceded by the parties, that no adjustments whatsoever were made in the appropriations for the bureau.

{¶ 141} The only logical conclusion is that the appropriations in Am.Sub.H.B. No. 107 do not relate to the substantive or procedural workers' compensation law. For this reason, its provisions are not "incident to the single subject of the bill." *Dix*, 11 Ohio St.3d at 146, 11 OBR at 441, 464 N.E.2d at 158.

{¶ 142} The one-subject rule exists to prevent riders from being attached to bills that are popular and so certain of adoption that the rider will secure adoption not on its own merits, but on the merits of the measure to which it is attached. Ruud,

"No Law Shall Embrace More Than One Subject" (1958), 42 Minn.L.Rev. 389, 391. A budget bill is susceptible to being weighed down with riders because "[i]t is a necessary and often popular bill which is certain of passage." Ruud at 413.

{¶ 143} Here the budget was due to expire on June 30, 1993. Without passage of the appropriations, the bureau and commission would have been unable to operate. Moreover, the General Assembly knew that Governor Voinovich would veto any budget bill not containing substantive reform.

{¶ 144} In *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 149, 580 N.E.2d 767, 770, this court held that where a legislative enactment violates the one-subject rule, the offending portion of the enactment may be severed. Although I have reservations about the holding in *Hinkle*, I believe that in applying *Hinkle* and severing the intentional tort and child labor exemption provisions, the majority did not go far enough. I believe all the non-appropriations provisions of Am.Sub.H.B. 107, not just the intentional tort and the child labor exemption provisions, flagrantly contravene the one-subject rule and must be declared null and void. I would sever all these non-appropriations provisions and leave intact the appropriations package.

{¶ 145} I also take issue with the majority's conclusion that Am.Sub.H.B. No. 107 does not violate the three-consideration provision of Section 15(C), Article II of the Ohio Constitution. Considering the facts as set forth in this dissent, i.e., grafting a second subject matter onto an appropriations bill, it stretches the imagination to hold that the original bill was not "vitally alter[ed]." See *Hoover*, 19 Ohio St.3d at 5, 19 OBR at 4, 482 N.E.2d at 579.

{¶ 146} The majority defines "vitally altered" as "departing entirely from a consistent theme." Assuming without deciding that this is a proper definition, even a cursory examination of the facts reveals that this substantive workers' compensation reform bill is a departure from a simple budget measure.

**{¶ 147}** Moreover, this is just not my opinion. As averred to by State Senator Burch in his affidavit attached to the relators' brief, "[t]here is no question that the version of H.B. 107 passed by the Senate vitally altered the version which the House had passed." These bills were treated separately and given separate consideration, until they were "logrolled" into one.

**{¶ 148}** Because the House Journal reflects that the House considered the "vitally altered" conference bill only once, the three-consideration requirement was not satisfied.

**{¶ 149}** As my colleague Justice Douglas recognized in his *Hoover* concurrence, the enforcement of the three-consideration rule "safeguard[s] the rights and opportunities of the citizens of Ohio to participate in the legislative process. Specifically, the purpose of the 'three reading' rule is to prevent hasty action and to lessen the danger of ill-advised amendment at the last moment. The rule provides time for more publicity and greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with his or her constituents, note the comments of the press and become sensitive to public opinion." *Hoover*, 19 Ohio St.3d at 8, 19 OBR at 7, 482 N.E.2d at 582. What occurred here falls far short of achieving the purpose of the three-consideration rule.

**{¶ 150}** Finally, the majority recognizes the enactment of Am.Sub.H.B. No. 107 unconstitutionally deprived the voters of their right of referendum. Yet, instead of severing the non-appropriations matters to cure this constitutional infirmity, as precedent dictates, the majority again attempts a compromise by overruling *State ex rel. Riffe v. Brown* (1977), 51 Ohio St.2d 149, 5 O.O.3d 125, 365 N.E.2d 876. This remedy is too little, too late.

**{¶ 151}** It is clear from the legislative history, that S.B. No. 152, the bill which engaged in massive reform, did not receive separate consideration. This bill was added to Am.Sub.H.B. No. 107 at the last minute and then logrolled through

both chambers. The riders should be found to be a nullity, not representing any policy of the state of Ohio. I believe the policy of this state should be that enunciated in the original H.B. No. 107 and in Sub.H.B. No. 106, the appropriations package, without the substantive amendments added by the Senate and the Conference Committee.

{¶ 152} I suspect the majority knows the real score, but it fails in its attempt to rectify an untenable situation. Its haphazard compromise in severing certain provisions and overruling precedent is insufficient. Because I believe this is a classic example of "logrolling" which prevented the House of Representatives from participating in the restructuring of the workers' compensation system, I cannot join in the majority's decision in Parts I, II, III, and IV.

{¶ 153} For the foregoing reasons, I would grant all writs.

_____